No. 21-13749

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DANIEL BAKER,

*Defendant-Appellant.*

_____

A Direct Appeal of a Criminal Case
From the United States District Court
for the Northern District of Florida, Tallahassee Division

_____

**INITIAL BRIEF OF APPELLANT**

RANDOLPH P. MURRELL
Federal Public Defender
227 N. Bronough Street, Ste. 4200
Tallahassee, Florida 32301
Telephone: (850) 942-8818
FAX: (850) 942-8809
Attorney for Appellant

No. 13749

United States v. Daniel Baker

**CERTIFICATE OF INTERESTED PERSONS**

As required by Federal Rule of Procedure 26.1 and 11th Cir. Rule

26.1-2, the following persons have an interest in the outcome of this case:

Baker, Daniel A.: Defendant/Appellant

Coody, Jason R.: Acting United States Attorney

Fields, Lazaro P.: Assistant United States Attorney

Fitzpatrick. Martin A.: United States Magistrate Judge

Kunz, Stephen M.: Assistant United States Attorney

McCommon, April J.: United States Probation Officer

Murrell, Randolph P.: Federal Public Defender

Vallejo, Elizabeth L: Assistant Federal Public Defender

Winsor, Allen C.: United States District Court Judge

C 1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. The issues include an important constitutional question regarding protected speech under the First Amendment to the United States Constitution. Counsel believes oral argument would allow the parties to clarify their positions and aid the Court in making its decision.

## TABLE OF CONTENTS

<u>Contents</u>                                                                                                    <u>Page</u>

STATEMENT REGARDING ORAL ARGUMENT ....................................i

STATEMENT OF JURISDICTION...........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE .................................................................3

    (i)    <u>Nature of the Case and Statement of Incarceration</u>.................3

    (ii)    <u>Course of Proceedings and Dispositions in the Court Below</u>.....3

    (iii)    <u>Statement of the Facts</u>................................................................3

    (iv)    <u>Standard of Review</u>..................................................................16

SUMMARY OF THE ARGUMENT ........................................................18

ARGUMENT .........................................................................................22

### ISSUE

Because Baker's social media posts were constitutionally protected speech, the trial court erred in denying his motion for a judgment of acquittal...............................................................22

## ISSUE II

The trial court violated Baker's fundamental due process right to present witnesses in his own defense when it excluded the testimony of law enforcement officers tending to show there was no group planning an attack on Florida's Capitol....................36

## ISSUE III

The trial court violated Baker's fundamental due process right to present witnesses in his own defense when it excluded David Phillips's testimony regarding the nature and history of the People's Protection Units. ...................................................43

CONCLUSION .........................................................................63

CERTIFICATE OF COMPLIANCE.........................................64

CERTIFICATE OF SERVICE.................................................65
....................................................................................................

# TABLE OF CITATIONS

**Cases**                                                                          **Page**

*Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485 (1984)................................................................................................ 17, 34

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ................................. 18, 28, 33, 39

**Chambers v. Mississippi*, 410 U.S. 284 (1973)...................................... 36, 44

*Chaplinsky v. State of New Hampshire*, 315 U.S. 568 (1942) ..................29

*Don's Porta Signs, Inc. v. Clearwater,* 829 F.2d 1051 (11th Cir. 1987) ..35

*Elonis v. United States*, 575 U.S. 723  (2015) ................................................23

*Flanigan's Enterprises, Inc. of Ga. v. Fulton County, Ga.*, 596 F.3d 1265 (11th Cir. 2010) ....................................................................35

*Fogel v. Collins*, 531 F.3d 824 (9th Cir. 2008)..............................................30

*Jackson v. Virginia*, 443 U.S. 307 (1979) .......................................................35

*Keohane v. Fla. Dep't. of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020).....17

*Old Chief v. United States*, 519 U.S. 172 (1997)...........................................61

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .............................................30

*Taylor v. Singletary,* 122 F.3d 1390 (11th Cir. 1997)..................................36

*United States v. Acosta,* 421 F.3d 1195 (11th Cir. 2005)............................16

***United States v. Bailey*, 319 F.3d 514 (D.C. Cir. 2003) ...............................61

*United States v. Bly*, 510 F.3d 453 (4th Cir. 2007) ......................................42

*United States v. Capers*, 708 F.3d 1286 (11th Cir. 2013) ..........................60

**\*\****United States v. Carlson*, 787 F.3d 939 (8th Cir. 2014) ............................41

**\*\*\****United States v. Edwards*, 388 F.3d 896 (D.C. Cir. 2004) ........................61

*United States v. Friday*, 525 F.3d 938 (10th Cir. 2008) ............................17

*United States v. Fullmer*, 584 F.3d 132 (3d Cir. 2009) ..............................29

*United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011) ..........................60

*United States v. Gillis*, 938 F.3d 1181 (11th Cir. 2019) ............................60

*United States v. Glover*, 846 F.2d 339 (6th Cir. 1988) ...............................31

*United States v. Griffin*, 778 F.2d 707 (11th Cir. 1985) ............................60

**\*\****United States v. Havelock*, 664 F.3d 1284 (9th Cir. 2011) (en banc) .......41

*United States v. Hazelwood*, 979 F.3d 398 (6th Cir. 2020) ......................61

*United States v. Jeffries,* 692 F.3d 473 (6th Cir. 2012) .............................24

*United States v. McRae*, 593 F.2d 700 (5th Cir. 1979) ...............................60

*United States v. Melendy,* 438 F.2d 531 (9th Cir. 1971) ...........................31

*United States v. Moccia*, 681 F.2d 61 (1st Cir. 1982) ................................61

*United States v. National Treasure Employees Union*, 513 U.S. 454 (1995) .......................................................................................................29

*United States v. Ramos*, 933 F.2d 968 (11th Cir. 1991) .............................17

*United States v. Roark*, 753 F.2d 991 (11th Cir. 1985) .............................60

*United States v. Ruan*, 966 F.3d 1101 (11th Cir. 2020) ............................18

*United States v. Wheeler*, 776 F.3d 736 (10th Cir. 2015)..........................33

*United States v. Williams*, 376 F.3d 1048 (10th Cir. 2004) .....................41

*United States v. Williams,* 553 U.S. 285 (2008)........................................28

*Virginia v. Black*, 538 U.S. 343 (2003).......................................... 29, 30

*Watts v. United States,* 394 U.S. 705 (1969)............................................28

*Whitney v. California*, 274 U.S. 357 (1927) .......................................... 29, 40

## Statutes

18 U.S.C. § 875(c) ....................................................... in passim

18 U.S.C. § 876....................................................................................41

18 U.S.C. § 876(c) ........................................................................ 40,41

18 U.S.C. § 3231 ...................................................................................1

18 U.S.C. § 3665 .................................................................................16

28 U.S.C. § 1291 ...................................................................................1

## Other Authorities

Fed.R.Cr.P. 29 .....................................................................................35

Fed.R.Evid. 401 ...................................................................................44

Fed.R.Evid. 401(a) ...................................................................... 59

Fed.R.Evid. 402 .......................................................................... 60

Fed.R.Evid. 402(b) ...................................................................... 59

Fed.R.Evid. 403 .......................................................................... 60

Fed.R.Evid. 702 .......................................................................... 44

USSG §2A6.1(b)(1) ...................................................................... 15

*Webster's Dictionary* 1686 (3d ed. 2002) .................................. 42

## STATEMENT OF JURISDICTION

The United States District Court, Northern District of Florida, Tallahassee Division, had jurisdiction pursuant to 18 U.S.C. § 3231 Following a jury's verdict of guilt, the district court orally imposed judgment and sentence on October 12, 2021, ECF No. 101, and entered written judgment and sentence on October 14, 2021. ECF No. 103. Appellant filed a timely notice of appeal on October 25, 2021. ECF No. 103. This appeal is from a final judgment that disposes of all parties' claims. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which provides that the court of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States unless a direct review may be taken to the Supreme Court.

1

# STATEMENT OF THE ISSUES

## I.

Because Baker's social media posts were constitutionally protected speech, the trial court erred in denying his motion for a judgment of acquittal.

## II.

The trial court violated Baker's fundamental due process right to present witnesses in his own defense when it excluded the testimony of law enforcement officers tending to show there was no group planning to attack Florida's Capitol.

## III.

The trial court violated Baker's fundamental due process right to present witnesses in his defense when it excluded David Phillips's testimony regarding the nature and history of the People's Protection Units.

## STATEMENT OF THE CASE

(i)    <u>Nature of the Case and Statement of Incarceration</u>

This is the direct appeal of a felony judgment and sentence of imprisonment. Appellant is incarcerated.

(ii)    <u>Course of Proceedings and Dispositions in the Court Below</u>

A federal grand jury charged Daniel Baker with two counts of transmitting in interstate commerce a threat to kidnap any person or to injure the person of another, a violation of 18 U.S.C. § 875(c). ECF No. 20. A jury heard the case and returned guilty verdicts on both counts. At the sentencing hearing, the trial court determined Baker's guideline range to be 41 to 51 months. ECF No. 118 at 34. The Court sentenced him to 44 months of imprisonment followed by three years of supervised release. *Id.* at 67.

(iii)    <u>Statement of the Facts</u>

Six days after a mob attacked the United States Capitol on January 6, 2021, Appellant, Daniel Baker, created a "public event" on his Facebook page. ECF No. 115 at 42. It was an invitation to those who might view the post to "Defend Tallahassee." Govt. Ex. 1A.    The

3

invitation listed the dates of January 17 through January 24. *Id.* It included a picture from the January 6 attack. *Id.* In his testimony at trial, Baker explained he created the post because he had anticipated an attack on Florida's Capitol sometime around the January 20 inauguration of President Biden but was unsure about the date it might occur. ECF No. 116 at 163.

The invitation included what, at trial was called Baker's "Call to Arms," Gov. Ex. 1B. *See* Fig. A.  According to it, "Armed racist mobs" were planning "to storm every American state Capitol," and that "We will fight back." It included strategy: "We will circle the state Capitol and let [sic] fight the cops and take the building. Then we will encircle them and trap them inside. We will drive them out of Tallahassee with every caliber available."  It added: "We must encircle them so they cannot escape down Apalachee Parkway. Militant friends will . . . push down Tennessee St and around Cascades Park with vehicles and coral [sic] the trump terrorists into the Capitol building." The message included a claim that "[w]e have already recruited an army [sic] armed combat veterans and volunteers." In capital letters it advised: "REMEMBER THAT THE

4

COPS WONT PROTECT US BECAUSE THE COPS AND THE KLAN

GO HAND IN HAND!" It added: "If you are afraid to die fighting the

enemy, then stay in bed and live. Call all of your friends and Rise Up!"



**Details**

Armed racist mobs have planted the Confederate flag in the nations Capitol while announcing their plans to storm every American state Capitol on or around inauguration day. We will fight back. We will circle the state Capitol and let them fight the cops and take the building. Then we will encircle them and trap them inside. We will drive them out of Tallahassee with every caliber available. They are staging an armed takeover so only an armed community can stop them! We can win! We have a duty to and a duty to win. We have already recruited an army armed combat veterans and volunteers. As we grow we must remember security. DO NOT RSVP TO THIS EVENT! JUST SHOW UP. WE ARE CHAOTIC MALESTROM OF WILLING HANDS. The plan is for the peaceful friends to March from Railroad square and MLK to the Capitol but DO NOT ENTER! DO NOT HELP COPS OR THE ENEMY! We must encircle them so they cannot escape down Apalachee Parkway. Militant friends will ride ahead in all sorts of wheeled vehicles, bikes, scooters, atv, motorcycle, car, truck and SUV. They will push down Tennessee St and around Cascades Park with vehicles and coral the trump terrorists into the Capitol building. The enemy will have high power rifles and explosives. The enemy is coming from every racist community in the area, including Alabama and Georgia. REMEMBER THAT THE COPS WONT PROTECT US BECAUSE THE COPS AND KLAN GO HAND IN HAND! If you are afraid to die fighting the enemy, then stay in bed and live. Call all of your friends and Rise Up!

GOVERNMENT EXHIBIT 1B

(*Fig. A*)

Two days later, a Tallahassee television station posted an article on its Facebook page announcing that "Tallahassee Police Chief Lawrence Revell says his department 'will be fully staffed' and prepared ahead of any potential Inauguration Day protests." ECF No. 115 at 44; Govt. Ex. 2A. That same day Baker followed with his own post on the television station's Facebook page, Govt. Ex. 2B.[1] *See* Fig. B. It was shorter than his January 12 post, but much the same. It stated: "Let them take the capitol and fight with the cops, SURROUND THEM AND TRAP THEM INSIDE!" He added: "This is an armed COUP and can only be stopped by an armed community!" Flyers that Baker printed for distribution, contained the same language in the same format. Both the post and the flyers contained a link to a Cable News Network article, "Extremists intensify calls for violence ahead of Inauguration Day." Def. Ex. 3.

---

[1] Government Exhibit 2A shows the television station's post and part of Baker's post. Government Exhibit 2B shows the entirety of Baker's post.



# CALL TO ARMS JANUARY 20TH!

Armed racists have planted the confederate flag in America's Capitol as they openly declared that they WILL CONTINUE to wage an ARMED COUP at every American Capitol, including Tallahassee, on Inauguration Day.

We need ALL FLORIDA RESIDENTS to RISE UP! Here in Florida we must encircle terrorists who attack the Capitol! Let them take the capitol and fight with cops,
SURROUND THEM AND TRAP THEM INSIDE!

Tally residents have answered the call to arms, including combat veterans. Join us! Help protect your community from terrorists. We WILL protect capitol RESIDENTS and CIVILIANS from armed racist mobs WITH EVERY CALIBER AVAILABLE.

This is an armed COUP and can only be stopped by an armed community!

If you're afraid to die fighting the enemy, stay in bed and live.

https://www.cnn.com/2021/01/08/us/online-extremism-inauguration-capit ol-invs/index.html



(*Fig. B*)

7

In the period of roughly two years before the January posts, Baker had been active on social media.[2] At the trial, the Government presented over 20 of his posts, including videos. The Government contended the posts were to be taken seriously and demonstrated Baker's "warrior-like public disposition." ECF No. 35 at 20; *see also* ECF No. 112 at 41. Defense counsel argued many were not to be taken seriously and others "were pretty stupid . . . [and] should have never been posted." ECF No. 116 at 227-228. The Court concluded: "a lot of them are things that plainly aren't serious, but you can have things that aren't serious mixed in with a lot of things that were very serious." ECF No. 118 at 62. They ranged from memes intended to mock right-wing posts and a drawing of baby Yoda by Baker to messaging from Baker where he claimed to have killed 16 ISIS fighters in Syria and messaging on January 14th in which Baker wrote "I am encouraging people to stay in bed and live or come fight if they are not afraid to die at the hands of the enemy." Govt. Ex. 30. The video posts

---

[2] The first posting introduced, Government Exhibit 7, was "dated September 16, 2018," ECF No. 115 at 54. The last posting was Government Exhibit 30, messaging dated January 14, 2021. ECF No. 115 at 83.

included one taken at a tourist attraction in Orlando, Machine Gun America, where Baker is seen smiling and firing a machine gun, saying "I'm coming back to Syria. I'm going to shoot any Jihadis or Turks that get in our way," Govt. Ex. 16, and a six-minute video showing Baker in combat in Syria with the People's Defense Units (the YPG) against the Islamic State (ISIS). Govt. Ex. 42.

Baker served in the United States Army for 18 months between 2006 and 2007. ECF No. 115 at 52-53. In 2008, Baker flew to Syria to fight with the YPG against ISIS. *Id.* at 114. He was with the YPG for about six months and spent two weeks in combat. ECF No. 116 at 107. His training was minimal, "firing about five rounds from three different weapons." *Id.*

The day after Baker's January 14 Facebook post, FBI agents, armed with a warrant, arrested Baker at his Tallahassee apartment. *Id.* at 18. At 8:00 that morning, posing as a food delivery service, they knocked on the door to Baker's apartment. *Id.* at 19. He opened the door a few inches, but almost immediately slammed it shut and locked it. *Id.* The agents broke open the door, threw in a flash-bang grenade that bounced off

9

Baker, and found him kneeling and face down on the floor. *Id* at 20, 175. They handcuffed him and brought him outside. *Id.* At trial there was disagreement about the details. An agent testified they had announced they were FBI agents when Baker opened the door, continued to announce themselves, and then broke open the door after Baker failed to open it. *Id.* at 19-20. Baker testified he did not know those at his door were FBI agents until they were breaking open the door. *Id.* at 173.

Baker, who in his trial testimony described a history of threats from right-wing zealots and his fear that their plans to attack the Capitol might bring them to his door, came to the door with his pistol behind his back. *Id.* at 125-128, 172. In approaching the door, he told his roommate to pick up a shotgun. *Id.* at 173. Baker testified he slammed the door shut, thinking it "might be some crazy dude hunting me down." *Id.* When he realized those at the door were FBI agents, he directed his roommate to drop the shotgun, threw down his pistol, and put himself face down on the floor. *Id.* at 173-175. The agents found the pistol and the shotgun on the floor. *Id.* at 20, 23. Both guns were loaded. *Id.* 21, 23. One agent testified that when questioned after his arrest, Baker said "he created

10

the posts . . . with the intent to scare people because he was afraid that Neo-Nazis were coming after him." ECF 115 at 87. Baker initially said he wasn't sure if he had made the statement and, during cross-examination, said he didn't think he had. ECF 116 at 164, 187

An FBI agent also testified that on January 10, Baker had ordered a .22 rifle, a replica of an AK-47 rifle. *Id.* at 30, 37. It had not arrived before Baker's arrest. *Id.* at 38.

The Government directed the bulk of its case to proving Baker's subjective intent, that he intended to issue a threat or knew others would see his posts as a threat. That effort included the social media posts and messaging. The trial court admitted them, mostly, over defense objections to relevancy. ECF No. 113 at 43-79. Nine of the posts had something to do with the YPG, including a patch meant to be sewn on a uniform, a photo of Baker's training group, the six-minute combat video, and a photo of Baker with a sniper rifle. The defense offered expert testimony meant to give the jury a brief history of the YPG and explain its role in Syria. The trial court excluded it, finding it risked confusing the jury. ECF No. 115 at 154-155.

11

In the three-day trial, the Government called five witnesses. In addition to introducing the social media posts, they described the circumstances of Baker's arrest and described two interviews of Baker. One was a March 2019 interview in Iraq by an FBI agent when Baker came to the United States consulate on his way home from Syria, in which he discussed his YPG training and his six months in Syria. *Id.* at 109-118. The second was a January 2020 interview by a Transportation Security Administration Officer in the Tampa Airport. The officer testified that Baker had mentioned fighting with the Kurds and had said he "enjoyed the thrill of the kill." *Id.* at 123. In his trial testimony, Baker denied the latter remark. ECF 116 at 162.

Defense counsel moved for a judgment of acquittal following the Government's case, arguing "as a matter of law the government hasn't proved that there was a true threat" and that "no reasonable jury could find Mr. Baker guilty of the offense" and renewed the motion at the close of all the evidence. *Id.* at 40, 201.The court denied the motion. *Id.* at 43, 201.

The defense called four witnesses including Baker. With the first witness, an investigator with the Federal Public Defender's Office, the defense introduced two newspaper articles, a January 12, 2021, article from the Tampa Bay Times (Def. Ex. 2) and a January 13, 2021, article from the Tallahassee Democrat (Def. Ex. 1). ECF No. 116 at 64, Both reported that law enforcement officials had been monitoring potential Inauguration Day threats to the Florida Capitol and had found none.

Before the start of the trial, the defense proffered the testimony of the Sheriff of Leon County and the Tallahassee Chief of Police. They would have testified that in their monitoring of potential threats, they found none. ECF No. 112 at 60-61. The court concluded such testimony would be irrelevant and granted the Government's motion to exclude it. *Id.* at 58.

Baker was the fourth defense witness. The two who preceded him testified he was a peaceful person and, in the words of one, "a little dog with a big bark." ECF 116 at 80. Baker discussed his service with the YPG, his unfavorable views of law enforcement, and threats he had received from right-wing extremists. He described himself as a radical

13

leftist and an anarchist—though with the explanation that his belief in anarchism meant only a more direct form of democracy. Baker described the circumstances of his arrest and explained what he had intended with the social media posts. *Id.* at 98-177. He told the jury he had the two firearms, at least in part, because of threats he had received from right-wing extremists. *Id.* at 148-149. He stated his purchase of the .22 rifle had no connection to his posts. *Id.* at 166.

Baker said he thought there was about a 25 percent chance an armed group might attack the Capitol and that he directed his call to arms intending to inspire the community to defend itself. *Id.* at 163. Though the call to arms stated he had recruited armed volunteers, Baker told the jury he recruited only his roommate and didn't expect anyone to volunteer. *Id.* at 166, 167. He added that he would have engaged in shooting only if someone fired at him, *id.* at 168, and that, if armed protestors had appeared, he, citing his medical training, probably would have only "hung back and scrapped up wounded people." *Id.* at 167. During cross examination, he conceded that in posting his call to arms he

was letting "the world know that there was going to be somebody defending Tallahassee besides law enforcement." *Id.* at 189.

The defense requested a jury instruction explaining that citizens had the right to carry arms to defend "the state." ECF No. 36, 116 at 51-54. The court denied the motion. ECF No. 116 at 54.

In its closing argument, the Government contended it had proved both Baker's subjective intent—that he had intended to issue a threat or knew his posts would be viewed as a threat, and met the objective test, showing a reasonable person would construe the posts as a true threat to another. ECF No. 116 at 215. The defense argued the Government had failed to prove either. *Id.* at 223.

At Baker's sentencing hearing, the trial court, using section 2A6.1 of the United States Sentencing Guidelines, concluded Baker's base offense level was 12. *See* PSR ⁋ 20, 22. Over the objection of the defense, the court, relying on Baker's ownership of the two firearms and the purchase of the .22 rifle, added six levels pursuant to USSG §2A6.1(b)(1) for conduct evidencing at intent to carry out the threat, ECF No. 118 at 29, two levels for obstruction of justice finding that Baker had testified

15

falsely when he said he would have only driven around and helped any wounded, *id.* at 17, and two levels for more than two threats because Baker had distributed his call to arms on 87 other occasions. *Id.* at 23. The resulting guideline range was 41 to 51 months. *Id.* at 30. The Court imposed a sentence of 44 months on each count with the sentences running concurrently, followed by three years of supervised release. *Id.* at 66.

Over the objection of the defense, the court, pursuant to 18 U.S.C. § 3665, ordered the confiscation of the shotgun and pistol found in Baker's apartment. In doing so, it concluded Baker's convictions amounted to a "judgment of conviction for . . . committing or attempting to commit a felony in violation of any law of the United States involving the use of threats, force, or violence . . ." *Id.*

(iv)   <u>Standards of Review</u>

**ISSUE I** — This Court reviews the denial of a motion for a judgment of acquittal *de novo*. *United States v. Acosta,* 421 F.3d 1195, 1197 (11th Cir. 2005). Typically, it views the facts and draws all inferences "in the light most favorable to the government." *Id.* However,

in cases such as Baker's where the Court faces the question of whether speech falls within the protection of the First Amendment, the Court conducts "an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that expression will not be inhibited." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 505 (1984). *See also Keohane v. Fla. Dep't. of Corr. Sec'y*, 952 F.3d 1257, 1290 (11th Cir. 2020) (Wilson, J., dissenting) (stating the Court conducts a "de novo review of 'constitutional facts' in First Amendment cases.")[3]

**ISSUES II and III** — The Sixth Amendment of the United States Constitution guarantees the right of the defendant to "compulsory process for obtaining witnesses in his favor." The extension of that right includes "[a] criminal defendant's right to present witnesses in his own defense during a criminal trial." *United States v. Ramos*, 933 F.2d 968, 974 (11th Cir. 1991). "A defendant's claim that an evidentiary ruling

---

[3] "[T]he special *Bose* rule applies only to 'constitutional facts' and not to the basic historical facts . . ." *United States v. Friday*, 525 F.3d 938, 950 (10th Cir. 2008).

17

deprived him of a constitutional right is reviewed *de novo.*" *United States v. Ruan*, 966 F.3d 1101, 1152-1153 (11th Cir. 2020).

## SUMMARY OF THE ARGUMENT

**ISSUE I** — Daniel Baker's two convictions for violating 18 U.S.C. § 875(c) rest upon his "Call to Arms"—his effort to defend Florida's Capitol against a non-existent group, conditioned upon unlikely events that never occurred. Because a review of the entire record shows his posts were constitutionally protected speech, the trial court erred in denying his motion for a judgment of acquittal.

"[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violations except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

Baker's two Facebook posts attempted to recruit others to defend the Florida Capitol against what he believed could be a repeat of the January 6, 2021, attack on the Nation's Capitol. As he explained in the

posts, the plan was to allow the attackers to overrun whatever law enforcement was present and trap them inside the Capitol.

There was, however, no evidence any group intended to attack the Capitol and, on its face, the possibility of an attack and, at that, a successful one, was negligible. Because of that, any potential harm resulting from his posts was neither imminent nor likely to occur. They were, therefore, advocacy protected by the First Amendment.

Likewise, Baker's posts, about people who apparently did not exist and conditioned upon unlikely events, cannot be "true threats" as defined by 18 U.S.C. § 875(c).

**ISSUE II** — The defense attempted to show the jury there was little risk of an attack on the Capitol, primarily because it didn't appear any group intended to attack it. The Government, however, objected to the testimony of the Sheriff of Leon County and the Tallahassee Police Chief that their monitoring uncovered no threats to the Capitol. The trial court upheld the objection and excluded the testimony, depriving the jury of (1) information they could have relied upon to determine the likelihood of any harm posed by Baker's posts, and (2) information showing the

19

Government had failed to prove Baker's posts had threatened kidnapping or injuring any "person" as the word is used in the statute. In doing so, the district court denied Baker the fundamental right of presenting witnesses in his defense.

Had the jury known more about the improbability of any attack on the Capitol, they would have known Baker's posts called for nothing either imminent or likely to occur.

The statute, 18 U.S.C. § 875(c), applies to anyone who "transmits in interstate or foreign commerce any communication containing any threat to kidnap any *person*, or any threat to injure *the person of another* . . ." 18 U.S.C. § 875(c). (Emphasis added). "Person," as used in the statute, is a human being—a real person, someone capable of having a sense of personal safety. The excluded testimony would have tended to show there were no real persons—no one having a sense of personal safety—planning to attack the Capitol. Had it been admitted, it would have increased the likelihood of an acquittal.

**ISSUE III —** The Government's emphasis on Baker's participation in the Peoples Protection Units (YPG) presented an unreasonable risk

the jury would find him to be of bad character or dangerous. The defense attempted to mitigate that risk by presenting the brief testimony of a qualified expert, David Phillips, who would have provided a succinct history of the YPG and the nature of it. In excluding the witness, the trial court left the jury to think what it might of the YPG and denied Baker the fundamental right of presenting witnesses in his defense.

The Government emphasized Baker's participation with the YPG, purportedly to show Baker's military experience. Baker's YPG training, however, was minimal: firing "about five rounds from three different weapons," lasted a month, and "didn't seem tactically sound." In closing argument, the Government reversed course, telling the jury it made little difference Baker wasn't impressed with his YPG training, given the training he received in the United States Army.

The best evidence of the risks posed by the emphasis at trial of Baker's YPG participation are the pre-trial and post-trial claims of the Government that, particularly because of purported links between the YPG and the Kurdistan Workers Party (PKK), Baker was dangerous. While the trial evidence omitted the claim of a link between the YPG and

the PKK, it didn't need to. A photo of Baker's fellow YPG trainees armed with a rocket launcher and their faces wrapped in strips of cloth to conceal their identity, the Mideast's reputation for extremism, the possibility of views consistent with the Government's pre- and post-trial claims available to any juror who followed current events, and the obvious emphasis on the YPG effectively told the jury Baker's YPG service was, at best, suspect. At worst—proof he was dangerous.

Had the defense witness been permitted to testify, he would have explained that the YPG came into being to defend Syrian Kurds against ISIS and how its fighters were the "boots on the ground" for the United States. Had he done so, he would have presented an accurate picture of the YPG and dispelled the risk of a conviction posed by the Government's emphasis.

## ARGUMENT

### ISSUE I
.
Because Baker's social media posts were constitutionally protected speech, the trial court erred in denying his motion for a judgment of acquittal.

22

Daniel Baker's two convictions for violating 18 U.S.C. § 875(c) rest upon his "Call to Arms"—his effort to defend Florida's Capitol against a non-existent group, conditioned upon unlikely events that never occurred. Because a review of the entire record shows his posts were constitutionally protected speech, the trial court erred in denying his motion for a judgment of acquittal.

The Government used the bulk of its case to demonstrate Baker's subjective intent, that he intended to issue a threat or knew his posts would be viewed as a threat. *See Elonis v. United States*, 575 U.S. 723 (2015). The evidence consisted of social media posts and messaging in a two-year span before Baker's January 2021 posts. The Government intended the posts to demonstrate Baker's "warrior-like public disposition." ECF No. 35 at 20. Baker's motion for a judgment of acquittal, however, claimed, not that the Government had failed to establish the required state of mind, but that it had failed the "objective" requirement of showing "[t]he communication [was] one that 'a reasonable observer would construe as a true threat to another.'" *Elonis*,

23

at 751 (Thomas, J., dissenting) (quoting *United States v. Jeffries,* 692 F.3d 473, 478 (6th Cir. 2012)).

Baker posted his "Call to Arms" on January 12, 2021, on his Facebook page and on January 14, 2021, on the Facebook page of a Tallahassee TV channel.[4] He announced in the January 12 posting that "armed racist mobs" were planning "to storm every American state Capitol." He stated, "We will fight back," and explained the strategy: "We will circle the state Capitol and let [sic] fight the cops and take the building. Then we will encircle them and trap them inside. We will drive them out of Tallahassee with every caliber available."  He added: "We must encircle them so they cannot escape down Apalachee Parkway. Militant friends will . . . push down Tennessee St and around Cascades Park with vehicles and coral [sic] the trump terrorists into the Capitol building." The message included a claim that "[w]e have already recruited an army [sic] armed combat veterans and volunteers." He advised: "REMEMBER THAT THE COPS WONT PROTECT US

---

[4] Government trial exhibit 1B was the January 12, 2021, posting. Government trial exhibit 2B was the January 14, 2021, posting.

BECAUSE THE COPS AND THE KLAN GO HAND IN HAND!" He concluded with: "If you are afraid to die fighting the enemy, then stay in bed and live." The posting two days later was shorter, but much the same. It stated: "Let them take the capitol and fight with the cops, SURROUND THEM AND TRAP THEM INSIDE!" He added: "This is an armed COUP and can only be stopped by an armed community!"[5]

Baker's posts followed the January 6, 2021, assault on the Nation's Capitol. While the possibility of an attack on January 20 initially may have seemed more likely following the January 6, 2021, assault on the Nation's Capitol, nothing the Government presented suggested there was

---

[5] Baker's Call to Arms matched some of the rhetoric of the day. An Associated Press quoted an online post of the Chairman of the St. Croix, Wisconsin Republican Party in which he urged followers to "prepare for war." Joe Reaves and Julie Smyth, *Some in GOP talk of civil war*, TALLAHASSEE DEMOCRAT, Jan. 17, 2021. The article states Phil Reynolds, "a member of the GOP central committee in California's Santa Clara County, declared on Facebook that "The war has begun. Citizens take arms!" Id. The Seattle Times reports state Representative Robert Sutherland wrote "prepare for war," "on his Facebook site, after declaring that 'Joe Biden is not now, nor will ever be my President.'" Danny Westneat, *'Prepare for war': A local GOP official goes all-in with election conspiracy theories*, THE SEATTLE TIMES, December 16, 2020.

25

any group planning a similar attack on Florida's Capitol, or that one was likely.

In advocating the use of force to defend Florida's Capitol, Baker aimed his message at those he thought might join him. Had there been a group planning to attack the Capitol, they could have seen his advocacy, given its posting on Facebook. There was, however, no evidence anyone complained about the posts. ECF 115 at 109. The Government viewed the absence of any group planning to attack the Capitol as irrelevant. The trial court agreed, concluding that "whether there is this band of armed racists or not it could or could not be a true threat." ECF No. 112 at 7.

Over the objection of the Government, the defense introduced two newspaper articles, Def. Ex. 1 and 2, reporting that law enforcement officials were unaware of any potential threats to the Capitol, but the Government objected to the admission of testimony from law enforcement officers tending to show the absence of any threat, and the trial court excluded the testimony.

When the trial court did so, defense counsel offered to proffer the intended evidence by presenting the testimony of "the sheriff and the

police chief." *Id.* at 60. In lieu of the presentation of testimony, the trial

court and the Government agreed to a allow defense counsel to make the

proffer himself, which he did: "I expect both the sheriff and the police

chief would come in and say, well, yes, they were monitoring the situation

and as far as they could tell there was no threat to the capitol." *Id.* at 60-

61.

The district court admitted the newspaper articles only to show

what information was available to the public about the likelihood of an

attack on Florida's Capitol. ECF No. 113 at    84. Following their

introduction, the court gave a cautionary instruction advising that the

information in the articles could not be substantive evidence:

> [Y]ou are not to treat those articles as evidence
> that what they say in the articles is true or that
> what the people quoted in the articles say is true.
> You are not to consider them for those. They are
> not evidence of that. The articles may be
> considered only to show what information was
> conveyed to the public at the time the articles were
> published.

ECF No. 116 at 67.

*A. The First Amendment protects mere advocacy of unlawful conduct.*

27

The statute at issue, 18 U.S.C. § 875(c), "which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." *Watts v. United States,* 394 U.S. 705, 707 (1969). First, though, "[w]hat is a threat must be distinguished from what is constitutionally protected speech." *Id.*

As the Court recognized in *Brandenburg*, advocating—but not inciting—unlawful action is protected by the First Amendment. Such speech only crosses the line into constitutionally proscribable speech when it is intended and likely to cause imminent lawless action. The analysis "unmistakably insists that any limit on speech be grounded in a realistic, factual assessment of harm." *United States v. Williams,* 553 U.S. 285, 322 (2008) (Souter, J., dissenting). Speculation about harm that might occur cannot justify the suppression of free speech:

> As Justice Brandeis reminded us, a "reasonable" burden on expression requires a justification far stronger than mere speculation about serious harms. "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. . . . To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced." *Whitney v.*

28

*California*, 274 U.S. 357, 376 (1927) (concurring opinion).

*United States v. National Treasure Employees Union*, 513 U.S. 454, 475-476 (1995); s*ee also United States v. Fullmer*, 584 F.3d 132, 154 (3d Cir. 2009) ("advocating violence that is not imminent and unlikely to occur is protected speech").

B. *The true threats analysis requires the Government to prove a reasonable person would find Baker's posts to be serious.*

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise a Constitutional problem." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571-572 (1942). They include a "true threat." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* The prohibition against true threats "'protects individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" *Id.* at 360*, (*quoting

29

*R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)). It includes "intimidation . . . where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Virginia v. Black*, 538 U.S. at 360. "In most cases where courts have found that speech constituted a true threat, the threatening speech was targeted against specific individuals or was communicated directly to the subject of the threat." *Fogel v. Collins*, 531 F.3d 824, 830 (9th Cir. 2008).

## C. Baker's posts amounted to constitutionally protected speech.

Baker made his Facebook posts in the midst of political turmoil. The incumbent President told the nation the election had been "stolen" and falsely claimed he had won the election. His supporters had stormed the Nation's Capitol, interrupting the certification process. Editorials called the events a threat to democracy.

Against that backdrop, Baker's posts bear little resemblance to the "true threats" of those nursing private grievances or those intending to terrorize others. Even if his posts are read as encouraging others to break the law, they were borne out of the politics of the day and were distinctly

30

political. In them, he "advocated" for the defense of the Florida Capitol. The action he advocated amounted to urging others to defend it against a group that seems not to have existed. He conditioned it upon the success of the group appearing at the Capitol and overrunning the law enforcement officers defending it. Given the unlikely nature of all of this, the "true threat" analysis is the wrong one.

The improbability of the proposed action is also what makes Baker's posts constitutionally protected speech under the requirements of *Brandenburg.* If defense of the Capitol or Baker's proposed tactics are harms, they are, at best, speculative. The improbability of it means the action was far from imminent.

The posts fail even the true threat test. Courts have found true threats in cases involving prisoners who threatened the President even though their incarceration would have prevented them from carrying out the threat. *See, e.g., United States v. Glover*, 846 F.2d 339, 344 (6th Cir. 1988); *United States v. Melendy,* 438 F.2d 531, 532 (9th Cir. 1971). Here, the trial court relied on that reasoning to conclude evidence intended to

show no one was planning to attack the Capitol was irrelevant.[6] The prisoner cases, however, do not hold a true threat includes a threat directed toward a person or group that doesn't exist.

Here, the Government presented no evidence a group intended to attack the Capitol or that one ultimately did. The January 12, 2021, article from the Tampa Bay Times introduced by the defense, though only to show what information was available to the public, stated that law enforcement officials "aren't aware of any credible threats toward Tallahassee or elsewhere in the state." Def. Ex. 2. The second article, published the next day in the Tallahassee Democrat, admitted with the same limitation, reported "Tallahassee Police Chief Lawrence Revell said there are no specific threats against Florida's Capitol, but that law enforcement is girding for the possibility of violence given recent FBI warnings." Def. Ex. 1. There is also the history. The Florida Capitol has

_____

[6] "THE COURT: I just think the cases go the other way from that. I mean, they make it clear that it doesn't have to be possible. You know, we have a lot of cases where incarcerated people are making threats that they are obviously not capable of carrying out imminently, things like that." ECF No. 112 at 21.

never been attacked—the only one east of the Mississippi that avoided capture during the Civil War.[7]  With no evidence there was anyone to defend against and what, on its face, was the unlikely prospect of an attack of the Capitol, and a successful one at that, no reasonable fact finder could have concluded beyond a reasonable doubt that Baker's statements were "true threats."

"[A]bsent an unusual set of facts, the question whether statements amount to true threats is a  question generally best left to a jury." *United States v. Wheeler*, 776 F.3d 736, 742 (10th Cir. 2015). Baker's case, however, presented just that—an unusual set of facts, and the jurors should not have been asked to make that determination. Baker's posts advocating improbable action were neither "directed to inciting or producing *imminent* lawless action," nor were they "*likely* to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. at 447 (emphasis added). His posts, therefore, were constitutionally protected speech, and the trial court should have granted his motion for a judgment of acquittal.

---

[7] *See* State of Florida webpage, "The Florida Capitol," at
https://www.floridacapitol.myflorida.com/the_capitol/capitol_history

33

*D. Appellate courts have an obligation to independently review those  facts determining whether speech is constitutionally protected.*

Because the trial court excluded testimony by local law enforcement officers that their efforts had uncovered no threat to the Capitol, the jury lacked relevant information about the likelihood of an attack and the existence or non-existence of a group planning an attack. That ruling, however, does not shield the information from this Court.

As the Supreme Court explained in the libel case of *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 505 (1984), where the limits of the First Amendment have been at issue "the Court has regularly conducted an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within the acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." Accordingly, "in cases raising First Amendment issues, an appellate court has an obligation to make an independent examination of the whole record in order to make sure the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* at 498 (internal punctuation and authority omitted); *see also Don's Porta*

34

*Signs, Inc. v. Clearwater,* 829 F.2d 1051, 1053 n. 9 (11th Cir. 1987) ("In cases involving first amendment claims, an appellate court must make an independent examination of the whole record."); *Flanigan's Enterprises, Inc. of Ga. v. Fulton County, Ga.*, 596 F.3d 1265, 1275 (11th Cir. 2010) ("This Court and the Supreme Court have explained that the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection." (Internal punctuation and authorities omitted)).

No reasonable finder of fact, then, "could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and the trial court should have granted Baker's motion for a judgment of acquittal. *See* Fed.R.Cr.P. 29. The requisite independent examination of the entire record incumbent upon this Court shows Baker's speech to be constitutionally protected, and this Court, for that reason as well, should enter an order directing the district court to reverse Baker's convictions on both counts.

35

## ISSUE II

> The trial court violated Baker's fundamental due
> process right to present witnesses in his own
> defense when it excluded the testimony of law
> enforcement officers tending to show there was no
> group planning to attack Florida's Capitol.

At the request of the Government, the trial court excluded
testimony the defense intended to present from the Sheriff of Leon
County and the Chief of the Tallahassee Police Department. Defense
counsel proffered the expected testimony: "I expect both the sheriff and
the police chief would come in and say, well, yes, they were monitoring
the situation and as far as they could tell there was no threat to the
capitol." ECF 112 at 60-61. The evidence would have allowed the jury to
assess any threat posed by Baker's postings and determine whether the
postings amounted to a threat to kidnap or injury any "person" as
required by the statute, 18 U.S.C. § 875(c). The testimony met the test of
relevancy in Fed.R.Evid. 401 and was admissible. It's exclusion violated
the fundamental due process right "of an accused to present witnesses in
his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see
also Taylor v. Singletary,* 122 F.3d 1390, 1394 (11th Cir. 1997) ("It is well-

36

established that defendants have a Fifth and Sixth Amendment right to present witnesses that are both material and favorable to their defense." (Internal punctuation and authority omitted)).

The defense had requested the Government to disclose the "intelligence assessment made by the Federal Bureau of Investigation regarding the threat to Florida's Capitol." ECF 42 at 1.[8] When the Government failed to produce the information, defense counsel filed a motion to compel. To show such information existed, defense counsel attached a newspaper article to the pleading. The article reported that the FBI had "hosted a conference call . . . with dozens of law enforcement agencies" and had reported "it had not received any specific intelligence about actual demonstrations targeting the [Florida] state Capitol." ECF N. 42-1 at 1. Counsel explained "What I'm trying to show a jury is this event wasn't, it wasn't conceivable this even would happen because there

---

[8] The Defendant's Motion to Compel, while asking for information about the FBI's intelligence, mistakenly stated "regarding the threat to Florida's Capitol on *January 6 2021*, the date of President Biden's inauguration." January 6, 2021, was, of course, the day the attack took place on the Nation's Capitol. Inauguration Day was January 20, 2021. The error, however, did not interfere with discussion of the issue. *See* ECF No. 112 at 3-12.

were no armed racists," ECF No. 112 at 8, and argued that "if there are no armed racists out there that plan to take over the Capitol the threat is hardly imminent." *Id.* at 7. The Government responded, contending that "whatever law enforcement knew or didn't know about anybody else other than the defendant is just irrelevant and immaterial for this trial." *Id.* at 11. The trial court, concluding that the actual likelihood of an attack on the Capitol was not an issue, *id.* at 10, denied the motion to compel finding the information was not "relevant to anything, any issue in the case." *Id.* at 12.

The defense had also sent trial subpoenas to the Sheriff of Leon County and the Chief of the Tallahassee Police Department. In its motion asking the court to quash the subpoenas, the Government argued the information sought was "not relevant and immaterial." ECF No. 45 at 7. When the court questioned the Government's standing to make the request on behalf of third parties, the court, with the agreement of the Government, treated the motion as a motion in limine. ECF No. 112 at 13-14. As with the motion to compel, defense counsel argued "we ought to be able to show the jury there was no group that planned to attack the

Capitol." *Id.* at 15. The court granted the Government's request to exclude the testimony concluding that what mattered was what information was available to the hypothetical reasonable person: "what's outside of that objectively reasonable person's knowledge wouldn't go into whether the objectively reasonable person would view it as a threat." *Id.* at 18.[9]

Defense counsel offered to bring the Sheriff and the Police Chief to court for a proffer of the excluded testimony. *Id.* at 59. The court, with agreement from the Government, allowed counsel to proffer the testimony rather than produce the witnesses. *Id.* at 60-61.

For advocacy of violence to be criminal, *Brandenburg* requires any potential harm to be imminent and likely to occur. *See also: Whitney v.*

---

[9] The argument included the question of whether a true threat included communication directed toward someone who didn't exist. The court conceded a threat directed toward "Bugs Bunny," wouldn't be a true threat, but concluded a threat toward someone who had died would be if the reasonable person would not have known about the death. *Id.* at 19. Defense counsel argued: "if you can go to jail for threatening somebody that is fictitious, I think you've really run afoul of the First Amendment" *id.* at 20, and that "if the threat has to be imminent it can't very well be imminent if there's no such person." *Id.* at 21.

*California*, 274 U.S. 357, 376 (1927) ("To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced." (Brandeis, J., concurring)). That assessment of its likelihood must be realistic, not speculative. As Justice Brandeis noted, fear of the harm doesn't suffice: "'Men feared witches and burnt women. . . .'" *Id.* Though the armed racists prepared to attack the Capitol may have been the equivalent of Justice Brandeis's "witches," the court's ruling prevented the jury from making that determination.[10]

The statute of which Baker was convicted applies to anyone who "transmits in interstate or foreign commerce any communication containing any threat to kidnap any *person*, or any threat to injure *the person of another* . . .*"* 18 U.S.C. § 875(c). (Emphasis added). A related statute, 18 U.S.C. § 876(c) prohibits the mailing of "any threat to kidnap any person or any threat to injure the person of the addressee or of a

---

[10] As explained in the first section of this brief, the trial court allowed the defense to introduce two newspaper articles that reported statements of law enforcement officials that they were unaware of potential threats. Upon the introduction of the articles, however, the court gave a cautionary instruction telling the jury the articles were introduced only to show "what information was conveyed to the public," and not as substantive evidence. ECF No. 116 at 67.

another . . ." In construing § 876(c), courts have defined "person" as a "natural person." *United States v. Carlson*, 787 F.3d 939, 947 (8th Cir. 2014). *See also United States v. Havelock*, 664 F.3d 1284, 1286 (9th Cir. 2011) (en banc) ("[W]e hold that § 876(c) refers exclusively to an individual, or to a natural person.")

For the cited cases, the distinction has been between a person and a corporation, but the reasoning applies to the distinction between an actual person and a non-existent or fictional person. The *Carlson* decision referenced the Tenth Circuit's opinion in *United States v. Williams*, 376 F.3d 1048, 1053 (10th Cir. 2004), where the court, in deciding a government official was a "person" within the meaning of § 876, relied upon one purpose of the statute: "'the preservation of the recipient's sense of personal safety.'" A "person," in the view of the court "'must be capable of having a sense of personal safety.'" *Id.* In *Havelock*, the court reasoned that "[t]he recipient's sense of personal safety is simply not implicated when the recipient is an entity." 664 F.3d at 1292.

A decision rejecting the distinction between entities and persons, which concluded § 876 applied to threats sent to the University of

41

Virginia, relied on a dictionary definition of "person" as "'a *human being*, a body of persons, or a corporation, partnership or other legal entity that is recognized by law as the subject of rights and duties.'" *United States v. Bly*, 510 F.3d 453, 461 (4th Cir. 2007) (quoting *Webster's Dictionary* 1686 (3d ed. 2002)) (emphasis added). Black's Law dictionary defines "person" as "a human being. – Also termed *natural person.*"[11]

A non-existent group of individuals planning an attack on Florida's Capitol is incapable of having a sense of personal safety. A non-existent person can't be a "human being," and certainly not one recognized by law as the subject of rights and duties. Thus, the jury necessarily had to determine whether Baker was threatening to kidnap or injure "persons." By excluding the testimony of the law enforcement officials, the trial court denied the jury critical information relevant to that decision.

---

[11] Available at:
https://1.next.westlaw.com/Link/Document/FullText?findType=Y&pubNum=223765&cite=BLACKS11THP10310&originatingDoc=I025ccfae808511e4b391a0bc737b01f9&refType=DA&originationContext=document&transitionType=DocumentItem&ppcid=bcf49780e5094df8b4dc5c965ba80b52&contextData=(sc.Search)#co_pp_sp_223765_person||1||

The excluded testimony was relevant to a realistic, factual assessment of any harm posed by Baker's posts, to whether the posts posed a serious threat, and whether there was a threat to kidnap or injure any "persons." In excluding it, the court denied Baker his fundamental due process right to present witnesses in his own defense and denied him a fair trial.

## ISSUE III

> The trial court violated Baker's fundamental due process right to present witnesses in his own defense when it excluded David Phillips's testimony regarding the nature and history of the People's Protection Units.

The trial court excluded the testimony of David Phillips, an expert the defense attempted to call to explain the nature of the Middle East militia, the Peoples Protection Units, known as the YPG. The Government made Baker's participation in the YPG a feature of the trial. Given that emphasis, the defense was concerned jurors, absent accurate information about the YPG, might conclude it was a terrorist organization or at least was opposed to the interests of the United States, and be left with an unfavorable view of Baker, increasing the likelihood

of a conviction. *See* ECF No. 112 at 35.[12]  Mr. Phillips's testimony met the test of relevancy in Fed.R.Evid. 401 and was admissible pursuant to Fed.R.Evid. 702 regarding expert testimony. It's exclusion violated the fundamental due process right, recognized in *Chambers v. Mississippi*, 410 U.S. at 302, "of an accused to present witnesses in his own defense."

Much of the Government's case consisted of evidence that Baker fought alongside the YPG. Nine of its exhibits had something to do with it:

- Exhibit 7: Baker in his YPG uniform, meditating and with a rifle, which Baker testified was inoperable, leaning against the wall behind him. ECF No. 115 at 54; ECF No. 116 at 136.

- Exhibit 8: Baker in his  YPG uniform juggling grenades. ECF No. 112 at 54.

---

[12] "MR. MURRELL: But is the jury more likely to convict him if they think he is dangerous? Of course, they are. And it just seems to me we ought to be able to present evidence to show them the nature of what he was doing." ECF No. 112 at 35.

It was an argument the trial court understood: "THE COURT: And that's your argument, is that if you leave it hanging out there, they may attribute some evil intent to it and think worse of your client." ECF No. 112 at 31.

- Exhibit 9A: a screenshot of Baker's cell phone with a photo of a fellow YPG fighter who had died and a note that he (Baker) was a "Squad Designated Sharpshooter at YPG." ECF No. 115 at 130; ECF No. 116 at 134-135.

- Exhibit 10: a photo of Baker with 11 of his fellow YPG trainees. ECF No. 115 at 55-56. The second page of the exhibit contained Baker's description of the photo: "This is my class and squad of comrades who volunteered to fight ISIS with the Kurdish YPG." In defense counsel's opening statement, he stated the obvious: those in the photo, with masks covering their faces and a rocket launcher visible, "look like dangerous terrorists." *Id.* at 34. *See Fig. C.*

- Exhibit 11: a photo of Baker in his YPG uniform carrying a sniper rifle. *Id.* at 57.

- Exhibit 12A and 12B: 12 A is the Facebook post with Baker's description of the video that is Exhibit 12B. The video Baker had uploaded is Exhibit 12B. It is a recording by Vice news, a media news outlet. It shows Baker and some of his fellow YPG members

in combat with ISIS. *Id.* at 58. The Government played six minutes of it for the jury.





*(Fig. C)*

46

- Exhibit 16: A short video of Baker firing a machine gun at an Orlando Tourist Attraction, Machine Gun America. In it, a smiling Baker says "I'm coming back to Syria. I'm going to shoot any Jihadis or Turks that get in our way." *Id.* at 107.

- Exhibit 31J: Photo of a YPG patch sewn on what appears to be camouflage material. ECF No. 116 at 25. *See Fig. D.*



*(Fig. D).*

47

- Exhibit 24: Facebook messaging that includes Baker's statement: "I'm a leftist sniper in the YPG International Battalion." *Id.* at 74.

Two of the Government's witnesses discussed Baker's service with the YPG. FBI Agent Denise Biehn discussed her interview with Baker at the United States consulate in Iraq. ECF No. 115 at 113-118. Transportation Security Agent Jeffrey Wynn, in discussing his interview with Baker, reported Baker talked about going "overseas" and fighting with the "Kurds." *Id.* at 123.

The trial court admitted most of the exhibits over the objections of the defense. *See* ECF No. 113 at 56-57, 62-63, 76. The Government argued the evidence was admissible because it "will help complete the story for the jury and buttress the Government's theory that, given his combat training and experiences, the Defendant's communications were knowingly intended as true threats—not empty, careless remarks." ECF No. 35 at 18-19. The trial court concluded the evidence was relevant because it showed Baker's "willingness to travel abroad and fight for what he believes in, risk death, all that is relevant to subjective intent." ECF No. 113 at 82. Mostly, defense counsel argued the evidence was

48

"overkill" *Id.* at 56. ("I just don't know how many times we have to tell them that he was with the YPG." *Id.* at 58; "Well, how much do they get to pile on to show that he has this training." ECF No. 112 at 49.)

Though at trial the Government argued the nature of the YPG was irrelevant, throughout the pretrial and posttrial proceedings it emphasized Baker's YPG participation, arguing the YPG was affiliated with a terrorist organization—the PKK—which led to the conclusion he was dangerous. In the criminal complaint it stated Baker had joined the YPG to fight ISIS and the Turkish Government and that the YPG was affiliated with the terrorist organization, the PKK:

> In 2017, Baker joined the People's Protection Unit ("YPG"), a group fighting in Syria against ISIS and the Turkish Government. The YPG is a sub-affiliate of Kurdistan's Working Party ("PKK") which has been designated a Foreign Terrorist Organization ("FTO") by the United States government.

ECF 2 at 4.

The trial court granted the Government's motion for detention. In his order, under the heading "Participation in Violent Acts in the Middle

49

East," the Magistrate Judge noted the YPG's affiliation with the "Marxist

terrorist organization," the "YPG":

> Among other things, the evidence showed that in
> 2017, the Defendant traveled to Iraq and Syria to
> join the "People's Protection Units" (also known as
> the "YPG") in fighting forces of the so called
> "Islamic State of Iraq and the Levant" and the
> Republic of Turkey. The YPG is affiliated with the
> Kurdistan Worker's Party, which is a Marxist
> terrorist organization."

ECF No. 19 at 11. *See also* ECF No. 18 at 18 (where the Magistrate Judge

found Baker's participation with the YPG, "affiliated with the Kurdistan

Worker's Party, which is a Marxist terrorist organization" supported his

finding there was probable cause to believe Baker intended "his

communications to serve as threats").

When Baker asked the trial court to reconsider his detention

several months later, the Government recycled the language from the

complaint:

> At the detention hearing, the Government
> presented evidence of the Defendant's military
> history and training, including time spent in the
> Middle East in armed combat with the People's
> Protection Units ("YPG"), a group fighting in Syria
> against the Islamic State of Iraq and Syria (ISIS)
> and the Turkish Government. ECF No. 2 ¶¶ 6-7.

50

> The YPG is a sub-affiliate of Kurdistan's Working Party ("PKK"), which has been designated a Foreign Terrorist Organization ("FTO") by the United States government."

ECF No. 39 at 7-8.

In its motion in limine arguing evidence of Baker's service in the YPG was "inextricably" linked with his call to arms, the Government repeated the language from the complaint. ECF No. 35 at 5.

In its motion for an upward variance, the Government argued Baker's participation with the YPG showed he was dangerous:

> The defendant's background also shows his dangerousness. In 2017, the Defendant traveled to Iraq and Syria to join the "People's Protection Units" (also known as the "YPG") in fighting forces of the Islamic State and the Levant" and the Republic of Turkey. As the Defendant told FBI Agent Denise Biehn in March of 2019, when he joined the YPG he expected the "PKK" (an organization the defendant acknowledged is a terrorist organization, which is a Marxist terrorist organization). The Defendant remained in the Middle East from approximately 2017 to 2019).

ECF No. 93 at 8.[13]

---

[13] Agent Biehn testified at the trial, but that testimony did not include the references to Baker's knowledge of the connection between the YPG and the PKK that the Government cited to support its claims at

51

In its motion in limine in which it argued against admitting the testimony of Mr. Phillips, the Government advised the court its testimony about the YPG would be limited and introduced only to show Baker's military experience:

> This is not a trial about U.S. foreign policy and the Government only intends to briefly discuss the Defendant's time with the YPG in its case in chief to provide the necessary background for the jury and to support the Government's theory that the Defendant was trained and proficient with military tactics and weaponry, including the AK-47. . . This limited evidence on the YPG will support the Government's contention that the Defendant's communications were intended as true threats."

ECF No. 43 at 15.

It was, as has been explained, not brief. It also did little to show Baker's training and proficiency. His training with the YPG amounted to firing "about five rounds from three different weapons." ECF No. 116 at 107. It was nothing like the training he received in the Army where "we would be firing constantly all day, sometimes all night for days on." *Id*. Baker told Agent Biehn that the YPG training "lasted about a month"

---

sentencing.

and that it "didn't seem tactically sound." ECF No. 115 at 115. In closing

argument, the Government reversed course, telling the jury it made little

difference Baker wasn't impressed with his YPG training, given the

training he received in the United States Army.[14]  Baker served in the

United States Army 18 months, *Id.* at 53. Other than a stipulation about

the time Baker served, the Government introduced no exhibits,

messaging, or videos about his Army training.

David Phillips is the Director of Columbia University's Program on

Peace-building and Human Rights, with a 14-year career as a senior

advisor at United States Department of State, and the author of a long

list of books and reports addressing the challenges faced by some of the

most conflicted areas in the world, including Syria and the Middle East.

ECF No. 113 at 21-24. Had he been permitted to testify, he would have

provided a brief history of the war in Syria against ISIS and described

---

[14] In closing argument, Assistant United States Attorney Fields stated it
was the training provided in the Army that was important:

> Now, importantly, the training he got overseas, it
> wasn't that impressive to him. Why? Because he
> was well trained here.

both the role of the YPG and the nature of the organization: In 2014, ISIS attacked the Kurds in the Syrian town of Kobani. The YPG attempted to defend the town but was "outmanned and outmatched until the U.S. intervened." *Id.* at 24. The YPG, a group of Kurdish militias, had formed during the Syrian civil war to "protect territories where Kurds reside." *Id.* ISIS conducted massacres within the town. "Villagers were decapitated, and their bodies mutilated." *Id.* At that point, the United States intervened, airlifting weapons and medical supplies. *Id.* at 26. The YPG served as "spotters so when the U.S. war planes were overhead they would identify ISIS targets," were the "boots on the ground" for the United States, were "indispensable partners" in the war against ISIS and were "able to push back ISIS." *Id.* at 26-27. His direct testimony was brief, occupying eight pages of transcript. When cross-examined during the proffer, Mr. Phillips explained that the YPG was "not in conflict with the Turkish government," something the Government had repeatedly claimed in its prior pleadings. *Id.* at 32. In mentioning the YPG role of

54

calling in airstrikes, Mr. Phillips would have corroborated testimony of Baker challenged by the Government.[15]

None of claims about the YPG being affiliated with a terrorist organization reached the jury. However, the findings of the Magistrate Judge and the Government's continued repetition show the importance attached to the information by the Judge and the Government.

The trial court took the view that if the Government didn't affirmatively claim the YPG was a terrorist organization, there was no

_____

[15] In his cross-examination of Baker, Assistant United States Attorney Stephen Kunz suggested Baker was making up his earlier testimony about the airstrikes:

> Q. Now, you also told the jury - - let me see if this is correct. Your testimony was that the U.S. military depended upon you using a Samsung tablet to call in strikes to assist the Kurds.
> A. That happened.
> Q. So that's your testimony? Military received communications, electronically, from you from a Samsung tablet?

ECF No. 115 at 195.

need to provide the jury with any information about it. *See* ECF No. 113 at 42-43. The court discussed its view in the two pretrial hearings, ECF No. 112 at 29-35; ECF No. 113 at 39-41. In its final decision, the district court concluded there was little if any relevancy to Mr. Phillips's testimony and, to the extent there was any relevancy found the "risk of confusion to the jury would substantially outweigh any probative value." ECF No. 115 at 154-155.

The trial court's conclusion, however, failed to consider the emphasis given Baker's YPG participation by the Government. The nine exhibits, including Government Exhibit 10 showing masked men with a rocket launcher and Exhibit 31J with a YPG patch as its centerpiece, and the testimony from the FBI agents implied Baker's participation with the YPG was important. Then, too, by itself, that the YPG fought in the Middle East, must have caused the jury concern. A Westlaw Edge search of "news" using "Middle East" and "extremism" in the same sentence, results in 9,456 articles.[16] The Magistrate Judge's reliance on Baker's participation in the YPG in his detention and probable cause decisions

---

[16] In a December 27, 2021, search.

and the Government's reliance upon it before and after the trial in support of its claim that Baker was dangerous, may be the best evidence that even a casual acquaintance with current events—one members of the jury surely had—could have influenced the jury's decision. By excluding Mr. Phillips's testimony, the trial court left the jury to its own guesses and preconceived notions about the YPG. It could have only worked to Baker's disadvantage. And there was little if any downside to admitting the limited testimony of Mr. Phillips. Contrary to the trial court's conclusion, the risk of confusing the jury seems nonexistent.

Baker, in his testimony, offered his take on the YPG:

> The YPG is a leftist militia of Kurds who carved out their own autonomous region in northeastern Syria, partially in response to overbearing government policies by the president of Syria, Bashar al-Assad. He gassed a lot of people using these deadly chemical weapons. Not like crowd control gas, like chlorine gas.

ECF No. 116 at 103. He also described ISIS:

> They believe in the literal, practical application of the Quran in the old school sense, and they are known for - - they are known as head-choppers. They behead their prisoners on video. Send the videos to their family. And they use this as a form of intimidation.

57

*Id.* at 105. In cross-examination, however, the Government challenged

Baker's credibility. In closing argument, the prosecutors told the jury he

was not credible.[17] With the prosecutors telling the jury Baker was not to

---

[17] Much of the Government's cross-examination challenged statements made by Baker during his direct testimony. *See, e.g.*:

> "You're telling us today that you were going to be the nice guy and help the law enforcement if they had a problem. But, in fact, your posts on January 12th, and again on the Call to Arms on January 14th, indicate you had no use for the police."

ECF 116 at 177-178

> "Which is it? What you told the jury today or what you put in your posts? *Id.* at 178.
> What is the truth today? Is the truth what you told the jury today or what you put in your posts about your feeling about law enforcement officers?"

*Id.*

In closing argument, the Government continued to challenge Baker's

credibility. *See, e.g.*:

> "He was waiting for law enforcement to show up on Inauguration Day to help them out? Ladies and gentlemen, I would submit to you that's not credible."

ECF 116 at 218

be believed, his limited testimony about the YPG and ISIS was no substitute for the expert testimony of Mr. Phillips.

The trial court found Mr. Phillips met the requirements of Rule 702 of the Federal Rules of Evidence and could testify as an expert witness. It excluded it under Rule 401 finding either it lacked "any tendency to make a fact more or less probable than it would be without the evidence" Fed.R.Evid. 401(a), or the information was "of no consequence in determining the action." Fed.R.Evid. 402(b). Alternatively, the court concluded Mr. Phillips's testimony would violate Rule 403 in that its

------------------------

> "And conveniently, his testimony, you can consider the credibility of the defendant, like any other witness. His statements, were they reasonable in light of the other evidence you have. Did it conflict with individuals? And you can consider, and what counsel stayed away from, the credibility of Mr. Baker with respect to his statements that he's denied making specific statements to the agents that the agents came in and said he did. . . . Of course, now he's telling you that because he knows that's a problem for him because that means he intended to scare folks with the posts that he did."

*Id.* at 241

probative value was outweighed "by the danger of . . . confusing the issues." Fed.R.Evid. 403.

All relevant evidence is admissible except as otherwise provided for by the Constitution, Congress, or other Rules." *United States v. Gamory*, 635 F.3d 480, 493 (11th Cir. 2011). *See also* Fed.R.Evid. 402. Relevant evidence is "generally admissible." *United States v. Capers*, 708 F.3d 1286, 1308  (11th Cir. 2013). "Rule 403 . . . is an extraordinary remedy to be used sparingly." *United States v. Griffin*, 778 F.2d 707, 709 (11th Cir. 1985). "The major function of Rule 403 is 'limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985), (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979)). The decision excluding a defense expert can violate a defendant's "constitutional right to present a defense." *United States v. Gillis*, 938 F.3d 1181, 1193 (11th Cir. 2019).

The trial court's narrow view of the value of Mr. Phillips's testimony failed to consider that "[i]n a criminal case, a fact is 'of consequence' if it makes it more or less likely that the defendant committed the charged

conduct." *United States v. Hazelwood*, 979 F.3d 398, 409 (6th Cir. 2020). "Courts do not require that each piece of evidence directly prove or disprove an element of the offense." *Id.* All that is required is that the evidence be "a step on one evidentiary route to the ultimate fact." *Old Chief v. United States*, 519 U.S. 172, 179 (1997). "If the jury inference is plausible, evidence to rebut that inference is relevant" *United States v. Bailey*, 319 F.3d 514, 518 (D.C. Cir. 2003), even if it is "relevant solely to refute a likely mistaken jury inference." *Id. See also United States v. Edwards*, 388 F.3d 896, 901 (D.C. Cir. 2004) ("when evidence gives rise to a 'plausible' jury inference – even if it is a mistaken one – 'evidence to rebut that inference is relevant.'" (quoting *Bailey*, 319 F.3d at 518)).

The risk presented by the repeated emphasis on Baker's participation in the YPG was that the jury would view him unfavorably and would be more likely to convict him because of it. *See Old Chief* 519 U.S. at 181, (quoting from then-Judge Breyer's opinion in *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)) ("uncertain of guilt [the jury] will convict anyway because a bad person deserves punishment.")

There was a real risk the overemphasis of Baker's participation in the YPG would cause the jury to view him unfavorably and, thereby, unfairly increase the likelihood of a conviction. The risk could have been mitigated had the trial court allowed the testimony of David Phillips. In excluding it, the court denied Baker his fundamental due process right to present witnesses in his own defense and denied him a fair trial.

## CONCLUSION

Based upon the argument and authority presented in ISSUE I, the Court should reverse the district court's denial of Baker's motion for judgment of acquittal and remand the case with directions to enter a judgment of acquittal on both counts of conviction. Based upon the argument and authority presented in either ISSUE II or ISSUE III, or the cumulative effect thereof, this Court should remand the case to the district court for retrial on both counts or for further consistent proceedings.

Respectfully submitted,


*s/Randolph P. Murrell*
**RANDOLPH P. MURRELL**
Federal Public Defender
Florida Bar No. 220265
227 N. Bronough Street, Suite 4200
Tallahassee, Florida 32301
Telephone: (850) 942-8818
FAX: (850) 942-8809
Attorney for Appellant

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[**X**] this brief contains 11,569 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ] this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[**X**] this brief has been prepared in a proportionally spaced typeface using WordPerfect X6 in Century Schoolbook, 14 point, or

[ ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

*s/Randolph P. Murrell*
**RANDOLPH P. MURRELL**
Federal Public Defender
Attorney for Appellant

64

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been furnished electronically in Acrobat format by Internet upload to this Court and to Assistant United States Attorney Lazaro Fields, and by U.S. Mail to Daniel Baker, Reg. No. 25765-509, FCI Memphis, P.O. Box 34550, Memphis TN 38184 all on this 18th day of January, 2022.

*s/Richard P. Murrell*
**RANDOLPH P. MURRELL**
Federal Public Defender

65