No. 21-13749

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES,

PLAINTIFF–APPELLEE,

v.

DANIEL BAKER,

DEFENDANT–APPELLANT.

On Appeal from the United States District Court
for the Northern District of Florida
4:21-cr-00010-AW-MAF-1

Judge Allen C. Winsor

## BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF FLORIDA, AND CATO INSTITUTE IN SUPPORT OF APPELLANT AND REVERSAL

Daniel Tilley
AMERICAN CIVIL LIBERTIES
    FOUNDATION UNION OF FLORIDA
Florida Bar No. 102882
4343 W. Flagler St., Suite 400
Miami, FL 33134
Tel.: (786) 363-2714
dtilley@aclufl.org

Ilya Shapiro
Thomas A. Berry
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, D.C. 20001
Tel.: (202) 842-0200
ishapiro@cato.org
tberry@cato.org

Vera Eidelman
Brian Hauss
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
veidelman@aclu.org
bhauss@aclu.org

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, amici curiae American Civil Liberties Union, American Civil Liberties Union of Florida, and Cato Institute state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Amici also file this Certificate of Interested Persons, pursuant to Eleventh Circuit Rule 26.1-1, 28-1, and 29-2:

American Civil Liberties Union (Amicus curiae)

American Civil Liberties Union of Florida (Amicus curiae)

Berry, Thomas A. (Counsel for Amici curiae)

Cato Institute (Amicus curiae)

Eidelman, Vera (Counsel for Amici curiae)

Hauss, Brian (Counsel for Amici curiae)

Shapiro, Ilya (Counsel for Amici curiae)

Tilley, Daniel (Counsel for Amici curiae)

Pursuant to Eleventh Circuit Rule 26.1-2(b), this Certificate includes only those persons and entities omitted from the Certificate contained in Appellant's Initial Brief.

Dated: January 25, 2022                    By:    /s/ *Vera Eidelman*
                                                   Vera Eidelman

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................... iii

STATEMENT OF INTEREST ................................................................1

INTRODUCTION .................................................................................3

ARGUMENT .........................................................................................5

I.      THIS COURT MUST CONSIDER MR. BAKER'S FIRST AMENDMENT DEFENSE INDEPENDENTLY, WITHOUT DEFERENCE TO THE COURT OR JURY BELOW. ........................................................5

II.     MR. BAKER'S STATEMENTS WERE NOT TRUE THREATS. ...............9

    A.      Mr. Baker's statements were expressly conditional. ..........................11

    B.      Mr. Baker's statements were about people who did not exist. ...........16

    C.      Mr. Baker's statements were communicated publicly on a heated political issue. ...................................................................19

III.    THIS IS A FAILED INCITEMENT PROSECUTION IN DISGUISE, WHICH IS IMPROPER UNDER THE PLAIN TERMS OF 18 U.S.C. § 875(C). ........................................................................21

CONCLUSION ...................................................................................26

# TABLE OF AUTHORITIES

## Cases

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) .............................................................................6

*Alexander v. United States*,
  418 F.2d 1203 (D.C. Cir. 1969).........................................................................11

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ...........................................................................................22

*Bauer v. Sampson*,
  261 F.3d 775 (9th Cir. 2001), *as amended* (9th Cir. Oct. 15, 2001) ..................20

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) .........................................................................12

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984), *reh'g denied*, 467 U.S. 1267 (1984) ..............................6, 7

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969) ...............................................................................17, 22, 23

*C.G.M., II v. Juvenile Officer*,
  258 S.W.3d 879 (Mo. Ct. App. 2008) .........................................................14, 16

*Chaplinsky v. New Hampshire*,
  315 U.S. 568 (1942) .............................................................................................9

*Citizen Publ'g Co. v. Miller*,
  210 Ariz. 513 (Ariz. 2005) .................................................................................20

*Elonis v. United States*,
  575 U.S. 723 (2015) ..........................................................................1, 2, 13, 17

*Fogel v. Collins*,
  531 F.3d 824 (9th Cir. 2008) .............................................................................17

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992) ...........................................................................................21

*Haughwout v. Tordenti*,
  332 Conn. 559 (Conn. 2019) ..............................................................................18

*Hess v. Indiana*,
  414 U.S. 105 (1973) .............................................................................................7

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ........................................................................................7

*Jenkins v. Georgia*,
  418 U.S. 153 (1974) ........................................................................................7

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ................................................................................. passim

*New York ex rel. Spitzer v. Operation Rescue Nat'l*,
  273 F.3d 184 (2d Cir. 2001) ............................................................................25

*New York Times, Co. v. Sullivan*,
  376 U.S. 254 (1964) ...........................................................................7, 10, 22

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*,
  290 F.3d 1058 (9th Cir. 2002), *as amended on denial of reh'g en banc* (9th Cir.
  July 10, 2002) ...............................................................................17, 19, 20

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ......................................................................................12

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ......................................................................................19

*Street v. New York*,
  394 U.S. 576 (1969) ........................................................................................7

*Terminiello v. City of Chicago*,
  337 U.S. 1 (1949) .........................................................................................21

*United States v. Alaboud*,
  347 F.3d 1293 (11th Cir. 2003), *overruled by United States v. Martinez*,
  800 F.3d 1293 (11th Cir. 2015) .........................................................................8

*United States v. Bagdasarian*,
  652 F.3d 1113 (9th Cir. 2011) ....................................................................25, 26

*United States v. Bly*,
  510 F.3d 453 (4th Cir. 2007) .............................................................................8

*United States v. Bozeman*,
  495 F.2d 508 (5th Cir. 1974) ...........................................................................12

*United States v. Callahan,*
  702 F.2d 964 (11th Cir. 1983) ...............................................................14, 15, 16

*United States v. Carmichael*, 326 F. Supp. 2d 1267 (M.D. Ala. 2004),
  *order supplemented*, 326 F. Supp. 2d 1303 (M.D. Ala. 2004) ...........................20

*United States v. Carrier*,
   672 F.2d 300 (2d Cir. 1982) ................................................................11

*United States v. Castillo*,
   564 F. App'x 500 (11th Cir. 2014)......................................................16

*United States v. Cooper*,
   865 F.2d 83 (4th Cir. 1989) ..........................................................13, 16

*United States v. Daughenbaugh*,
   49 F.3d 171 (5th Cir. 1995) ...................................................................9

*United States v. Fleury*,
   20 F.4th 1353 (11th Cir. 2021)........................................................8, 19

*United States v. Hanna*,
   293 F.3d 1080 (9th Cir. 2002) ...............................................................8

*United States v. Malik*,
   16 F.3d 45 (2d Cir. 1994) ......................................................................9

*United States v. Martinez*,
   736 F.3d 981 (11th Cir. 2013), *judgment vacated on other grounds*,
   576 U.S. 1001 (2015) .......................................................................9, 11

*United States v. O'Dwyer*,
   443 F. App'x 18 (5th Cir. 2011)......................................................18, 19

*United States v. Parr*,
   545 F.3d 491 (7th Cir. 2008) .................................................................9

*United States v. Pinkston*,
   338 F. App'x 801 (11th Cir. 2009)........................................................8

*United States v. Schiefen*,
   139 F.3d 638 (8th Cir. 1998) .................................................................9

*United States v. Wheeler*,
   776 F.3d 736 (10th Cir. 2015) ...............................................................9

*United States v. White*,
   670 F.3d 498 (4th Cir. 2012), *abrogated on other grounds by*
   *United States v. White*, 810 F.3d 212 (2016)................................21, 24

*Virginia v. Black*,
   538 U.S. 343 (2003) ................................................................... passim

*Watts v. United States*,
   394 U.S. 705 (1969) ................................................................... passim

**Statutes**

18 U.S.C. § 875(c) ............................................................................ passim

18 U.S.C. § 879(a) ................................................................................25

**Other Authorities**

Andrew Solender, *Gaetz Tells Supporters Second Amendment Is for 'Armed Rebellion Against the Government,'* Forbes, May 28, 2021 ...................4

Lee Fang, *Republican Congressman Legitimizes Violence as Response to Election Dispute*, The Intercept, Jan. 7, 2021 ........................................................3

Paul LeBlanc & Daniel Dale*, Rep. Cawthorn Talks of 'Bloodshed' Over Future Elections as He Pushes Voting Lies*, CNN, Aug. 30, 2021 ......................4

Philip Bump, *The Alarming Downward Spiral of the Election-Fraud Conspiracy Theory*, Wash. Post, June 24, 2021 ............................................4, 17

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The ACLU of Florida is a state affiliate of the national ACLU. The ACLU and its affiliates have appeared as both direct counsel and amicus curiae in numerous free speech cases, including cases outlining the scope of the true threats doctrine. *See, e.g.*, *Elonis v. United States*, 575 U.S. 723 (2015) (amicus); *Virginia v. Black*, 538 U.S. 343 (2003) (counsel); *Watts v. United States*, 394 U.S. 705 (1969) (amicus). The proper resolution of this case is a matter of substantial interest to the ACLU and its members.

The Cato Institute is a non-partisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established to restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences and forums, and produces

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), counsel for amici curiae certifies that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

the annual *Cato Supreme Court Review*. This case is of central concern to Cato

because the First Amendment is part of the bulwark for liberty that the Framers set

out in the Constitution. Cato has participated as amicus in many cases concerning

the correct interpretation and application of First Amendment doctrine, including

the proper bounds of the true threats doctrine. *See, e.g.*, *Elonis*, 575 U.S. 723.

## INTRODUCTION

Daniel Baker has been sentenced to forty-four months in prison and three years of supervised release for speaking out publicly in the days after the January 6, 2021 attack on the U.S. Capitol. Addressing a public audience on Facebook, he condemned those who took part in the attack. And he encouraged others to fight back if, and only if, an armed mob of racist terrorists—a group that, according to public reports of law enforcement intelligence, did not exist—attacked the Florida Capitol, overpowered police officers, and successfully occupied the building.

While potentially shocking, Mr. Baker's posts were in line with much of the rhetoric of the day. Throughout 2021, many public statements about the 2020 election and the events of January 6 were sharp, inflamed, and invoked violence. On January 7, Republican Representative Mo Brooks of Alabama explained that, in modern-day America just as in Nazi Germany, when people "los[e] faith in the ballot box," one of their few remaining options is to "resist, often through violence."[2] In May, Republican Representative Matt Gaetz of Florida told supporters, "We have a Second Amendment in this country, and I think we have an obligation to use it"— specifically "to maintain an armed rebellion against the government if that becomes

---

[2] Lee Fang, *Republican Congressman Legitimizes Violence as Response to Election Dispute*, The Intercept (Jan. 7, 2021), https://theintercept.com/2021/01/07/capitol-violence-republican-mo-brooks/.

necessary."[3] In June, while discussing the "traitors who meddled with our sacred democratic process," an OAN correspondent reminded listeners that "in the past, America had a very good solution for dealing with such traitors: execution."[4] And, in August 2021, Republican Representative Madison Cawthorn of North Carolina claimed that "rigged" and "stolen" elections would "lead to one place, and that's bloodshed."[5] Amidst such rhetoric, Mr. Baker's posts were not unusual—but the fact of this prosecution is.

Mr. Baker's posts were protected by the First Amendment. No reasonable person could have felt individually threatened by Mr. Baker's statements, because nobody was planning to attack the Florida Capitol. Likewise, no reasonable person reading Mr. Baker's statements would have understood them as expressing a serious intent to lay siege to the Florida Capitol.

Mr. Baker's statements were expressly conditioned on outlandish events: a group of individuals attacking the Florida Capitol, overpowering police, and

---

[3] Andrew Solender, *Gaetz Tells Supporters Second Amendment Is for 'Armed Rebellion Against the Government*,' Forbes (May 28, 2021), https://www.forbes.com/sites/andrewsolender/2021/05/28/gaetz-tells-supporters-2nd-amendment-is-for-armed-rebellion-against-thegovernment/?sh=7cd8da3a196f.

[4] Philip Bump, *The Alarming Downward Spiral of the Election-Fraud Conspiracy Theory*, Wash. Post (June 24, 2021), https://www.washingtonpost.com/politics/2021/06/24/alarming-downward-spiral-election-fraud-conspiracy-theory/.

[5] Paul LeBlanc & Daniel Dale*, Rep. Cawthorn Talks of 'Bloodshed' Over Future Elections as He Pushes Voting Lies*, CNN (Aug. 30, 2021), https://www.cnn.com/2021/08/30/politics/madison-cawthorn-elections/index.html.

occupying the building. While those events may have appeared more likely in the days following the January 6 attack, law enforcement intelligence—and public reporting about that intelligence—showed no threat of a coup at the Florida Capitol. In addition, because no one planned to attack the Florida Capitol, Mr. Baker's statements encouraged taking action against people who did not exist. And the statements were communicated to a general audience on a matter of public concern. Separately, each of these three factors weighs in favor of reversal; together, they require it.

Finally, the government's prosecution of Mr. Baker under 18 U.S.C. § 875(c) was improper by the statute's own terms. The law prohibits threatening "to injure the person of another"—not *encouraging others* to injure someone else. Mr. Baker's statements, which urged a general public over whom he exercised no control to take action in connection with a heated political issue, are not the kinds of statements encompassed by the plain language of 18 U.S.C. § 875(c).

 For these reasons, this Court should reverse the court below.

## ARGUMENT

### I.   THIS COURT MUST CONSIDER MR. BAKER'S FIRST AMENDMENT DEFENSE INDEPENDENTLY, WITHOUT DEFERENCE TO THE COURT OR JURY BELOW.

The government may argue that this Court should review Mr. Baker's First Amendment claim under the more deferential standard of review it "[o]rdinarily"

applies to a district court's denial of judgment of acquittal—but, as this Court has recognized, "First Amendment issues are not ordinary." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1203 (11th Cir. 2009). Rather, "[w]here the First Amendment Free Speech Clause is involved[, this Court's] review of . . . findings of 'constitutional facts,' as distinguished from ordinary historical facts, is *de novo*." *Id.* (collecting cases).

Constitutional facts are those "few core facts that determine a First Amendment free speech issue." *Id.* at 1205. Because such facts determine not only "the unprotected character of particular communications," but also "the limits of the unprotected category," an appellate court's independent review of them is "vitally important." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503, 505 (1984), *reh'g denied*, 467 U.S. 1267 (1984). "[T]he stakes—in terms of impact on future cases and future conduct—are too great to entrust them finally to the judgment of the trier of fact." *Id*. at 501 n.17.

This holds whether that trier "b[e] a jury," as here, "or a trial judge." *ACLU of Fla.*, 557 F.3d at 1206 (quoting *Bose*, 466 U.S. at 501). The Supreme Court has rejected "the contention that a jury finding of [unprotected speech] is insulated from review so long as . . . there is some evidence to support its findings." *Bose*, 466 U.S. at 507. Instead, if the question is whether "the communication in issue

[falls] within one of the few classes of 'unprotected' speech," a reviewing court must engage in "an independent examination of the evidence." *Id.* at 503, 506.

It is through such "exercise[] of independent judgment" that the Supreme Court has "mark[ed] out" and guarded "the limits of" a variety of First Amendment standards, *id.* at 505—from fighting words, *id.* (citing *Street v. New York*, 394 U.S. 576, 592 (1969)), to incitement, *id.* at 505–06 (citing *Hess v. Indiana*, 414 U.S. 105, 108–109 (1973) (per curiam)), to obscenity, *id.* at 506–07 (citing *Jenkins v. Georgia*, 418 U.S. 153, 159–61 (1974)), to defamation, *id*. at 508; *see also New York Times, Co. v. Sullivan*, 376 U.S. 254, 285 (1964), to unprotected conduct, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 567 (1995).

While the Supreme Court has not yet explicitly addressed the need for independent review of the record in a true threats case, it appears to have engaged in such a review in the seminal case establishing that the government may punish "true threats" consistent with the First Amendment. *Watts v. United States*, 395 U.S. 705, 708 (1969). Without mentioning any deference to the findings of fact or the jury verdict at trial, the Court reviewed the record—including the "context" and "expressly conditional nature" of the challenged statement, as well as "the reaction of the listeners"—"with the commands of the First Amendment clearly in mind." *Id.* at 707, 708. It sought to ensure that "[w]hat is a threat . . . be distinguished from

what is constitutionally protected speech." *Id.* at 707. And, contrary to the jury

below, it concluded that the statement at issue could not have been interpreted as

anything but political hyperbole and so "remanded [the case] with instructions that

it be returned to the District Court for entry of a judgment of acquittal." *Id.* at 708.

Since then, several appellate courts have recognized that, in a true threats

prosecution, "whether a statement is a true threat" must be reviewed *de novo*.

*United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002); *see also United

States v. Bly*, 510 F.3d 453, 457 (4th Cir. 2007). To be sure, this Court has applied

a more deferential standard in true threats cases when that is all that appellants—

focused on the lack of sufficient evidence, not the First Amendment boundaries of

"true threats"—have sought. *See, e.g.*, *United States v. Pinkston*, 338 F. App'x 801,

801–02 (11th Cir. 2009) (per curiam); *United States v. Alaboud*, 347 F.3d 1293,

1295 (11th Cir. 2003), *overruled by United States v. Martinez*, 800 F.3d 1293 (11th

Cir. 2015) (per curiam). But this Court has also recognized that the proper standard

of review is *de novo* if the question is, as here, whether a district judge and jury

properly applied First Amendment law to a defendant's allegedly threatening

statements. *United States v. Fleury*, 20 F. 4th 1353, 1362 (11th Cir. 2021).[6]

─────────────────

[6] Some appellate courts have applied a more deferential standard of review even
where a defendant has raised a First Amendment defense. In most instances, they
have done so while recognizing that, if a defendant were "making an argument
about the scope of the true threat doctrine and the proper definition of true threats,
[the] review would be de novo." *United States v. Parr*, 545 F.3d 491, 497 (7th Cir.

## II.    MR. BAKER'S STATEMENTS WERE NOT TRUE THREATS.

"The critical issue for the true threats doctrine is distinguishing true threats from mere political hyperbole." *United States v. Martinez*, 736 F.3d 981, 984–85 (11th Cir. 2013) (citing *Watts*, 394 U.S. at 707–08), *judgment vacated on other grounds*, 576 U.S. 1001 (2015). For that reason, like all "classes of speech, the prevention and punishment of which has never been thought to raise any constitutional problem," the "true threats" exception covers a "well-defined" and "narrowly limited" category, *Virginia v. Black*, 538 U.S. 343, 358 (2003) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)); specifically, those few statements that are "mean[t] to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id*. at 359.

Mr. Baker's statements fall outside of that category for three reasons. They were expressly conditional; the only people who could have been the subjects of the statement—"[T]rump terrorists . . . coming" to "storm [the Florida] state Capitol," Gov. Exh. 1B—did not exist; and the posts were communicated to the

---

2008). *See also United States v. Wheeler*, 776 F.3d 736, 742 (10th Cir. 2015) (recognizing that where a case raises "an 'unusual set of facts,' the question whether statements amount to true threats 'is [not] a question . . . best left to a jury'" (quoting *United States v. Malik*, 16 F.3d 45, 51 (2d Cir. 1994)). In others, they have simply ignored the stakes of appellate review. *See United States v. Schiefen*, 139 F.3d 638, 639 (8th Cir. 1998) (per curiam); *United States v. Daughenbaugh*, 49 F.3d 171, 173 (5th Cir.1995).

public, on a heated political issue. Each of these factors weighs against the conclusion that Mr. Baker's statements constituted true threats; in combination, they tilt the scales decisively against conviction.

*Watts* offers a helpful roadmap. Even as it acknowledged the category of true threats in that case, the Supreme Court emphasized the essential distinction between political hyperbole and true threats. 394 U.S. at 708. It held that whether "the Government [has] prove[n] a true 'threat'" "must [be] interpret[ed]" subject to the "commands of the First Amendment" and "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 707, 708 (quoting *New York Times Co.*, 376 U.S. at 270). Applying that rule to the case before it, the Supreme Court held that a draft protester could not be convicted of threatening the President for stating, at a public rally opposing the Vietnam War, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706. Emphasizing "the expressly conditional nature of the statement"—that the speaker would only shoot the President if drafted—and the "context" of the utterance—that it was spoken at a public protest—the Court held that the statement "could [not] be interpreted" as a true threat. *Id.* at 708.

The same is true here. As in *Watts*, Mr. Baker's statements were expressly conditional. Mr. Watts conditioned his threat on "an event he vowed would never

occur." *Martinez*, 736 F.3d at 985 (citing *Watts*, 394 U.S. at 707–08). Here, Mr. Baker conditioned it on a highly implausible series of events—rioters storming the Florida Capitol, attacking the police officers guarding the building, successfully overpowering them to take the building, and Mr. Baker showing up with an armed militia of supporters. As in *Watts*, the statements were broadcast to the public in the context of a heated political debate. And, while Mr. Watts specifically named President Johnson as the target of his speech, Mr. Baker focused his statement on a non-existent treasonous militia. Taken together, all of these factors suggest that no reasonable person would have perceived Mr. Baker's statement as a serious expression of intent to besiege the Florida Capitol.

### A.    Mr. Baker's statements were expressly conditional.

Since *Watts*, courts have recognized that "the conditional nature of a statement, whether or not a complete defense, is certainly a factor bearing on the question whether the statement is an exaggerated expression rather than a 'threat.'" *Alexander v. United States*, 418 F.2d 1203, 1206 (D.C. Cir. 1969); *see also United States v. Carrier*, 672 F.2d 300, 306 (2d Cir. 1982) (in assessing whether a statement is a true threat, "how it was spoken, i.e., plainly and unconditionally or in jest" must be considered).

In a decision that is binding on this Court,[7] the Fifth Circuit, too, recognized the distinction between, on the one hand, "statements . . . phrased in conditional terms," and, on the other, a statement that "was express and unequivocable," and so "me[t] the test of what amounts to a threat" because it "would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *United States v. Bozeman*, 495 F.2d 508, 510 (5th Cir. 1974) (cleaned up).

This logic aligns with the purposes for which the true threats doctrine exists— namely, "protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur[.]" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992); *Black*, 538 U.S. at 360 (same). Where, as here, an alleged threat targets people who do not (and never did) exist— and is further conditioned on that non-existent group taking a series of improbable actions, followed by a similarly improbable series of counteractions by the defendant and his non-existent allies—there are no individuals who could reasonably fear the threatened violence.

Such statements are not true threats because they do not communicate an objectively "serious expression" of intent to commit unlawful violence. *Black*, 538

---

[7] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that all decisions of the "old Fifth" Circuit handed down prior to that court's close of business on September 30, 1981, are binding precedent in the Eleventh Circuit).

U.S. at 359. *See also Elonis v. United States*, 575 U.S. 723, 747 (2015) (Alito, J., concurring in part and dissenting in part) (a true threat must be likely "to be taken seriously"). This "serious expression" requirement underlies many conditional threats cases.

For example, the Fourth Circuit upheld a defendant's conviction for telling a U.S. government official that "he had checked out and chosen four sites in the District of Columbia for the assassination [of the Prime Minister of India]," even though it also included a fantastical statement about receiving funding from the Secret Service, because the statement "was made in a serious vein." *United States v. Cooper*, 865 F.2d 83, 85 (4th Cir. 1989). In contrast, the court noted that a "charge based upon [the defendant's statement that he would kill India's Prime Minister outside the United States if paid $50,000 by the CIA to do it] was dismissed, for it was clearly conditional and its premise absurd." *Id.* at 85. Thus, it concluded that, while a threat conditioned on an absurd premise cannot be serious and so is protected, one that expresses a genuine intent to commit violence can constitute a true threat even if it includes fanciful language.

Similarly, in *C.G.M., II v. Juvenile Officer*, a Missouri court held that one teenager, C.G.M., inquiring of another whether he "wanted to help blow up the school *if* C.G.M. got dynamite for his birthday" was not a true threat, in part because "a statement that a juvenile would be receiving dynamite from his parent for his

birthday alone makes the listener question whether the speaker is making a serious expression to cause an incident involving danger to life." 258 S.W.3d 879, 883 (Mo. Ct. App. 2008).

This Court's conditional threats caselaw reflects a similar logic. It distinguishes between statements that make "the threat itself" conditional, and so are protected by the First Amendment, and those that place conditions only on the "carrying out of the threat." *United States v. Callahan,* 702 F.2d 964, 966 (11th Cir. 1983) (per curiam). Conditional threats are statements that, in the absence of the specified condition, no reasonable person would understand as expressing a serious intent to commit violence. For example, the statement "If anyone ever assaulted my wife, I would kill them" is not a true threat, because any reasonable listener would understand that the speaker is speculating about how they would respond to a hypothetical situation. On the other hand, statements that would be understood by a reasonable listener as expressing a genuine intent to commit violence are actionable, even if the speaker stipulates that certain conditions must be met before they will act.

Applying that rule in *Callahan*, this Court upheld the conviction of a man for sending a letter to the Director of the Secret Service stating, "It is essential that Reagan and Bush are assassinated on Inauguration Day in front of television cameras"; promising, "If you can arrange for me to get into the act, I will be willing

14

to accept the responsibility"; and concluding "I will be in Washington in a few hours." *Id*. at 965. The Court rejected the defendant's argument that "his letter constituted a conditional statement that was nothing more than political hyperbole" because, while his ability to carry out the threat "might have been conditional upon Secret Service aid and agreement," the threat itself—an unequivocal statement of his "read[iness] to help carry out" the "essential" assassination, specifying "a date, time, and place," and "manifest[ing] a willingness to accept the consequences of the murders"—was not conditional. *Id.* at 965–966.

In contrast, here, no reasonable person would have perceived Mr. Baker's statements as reflecting a genuine intent to besiege the Florida Capitol. The apocalyptic conditions described in his statements—an "[a]rmed racist" mob from several nearby states with "high power rifles and explosive[s]" staging "an ARMED COUP" and "fight[ing] with cops" at the Florida Capitol building, which would then be "encircle[d]" by Mr. Baker and his "[m]litant friends" in "all sorts of wheeled vehicles, bikes, scooters, atv, motorcycle, car, truck and SUV," Gov. Exh. 1B— would have struck a reasonable listener as loose talk inspired by an overactive imagination. While the events of January 6 may have made the events Mr. Baker described seem more probable than they would have appeared at any other time, public reports of law enforcement intelligence specific to Florida made clear that no threat of an attack at the Florida Capitol existed. Thus, much like the statements in

*Cooper* and *C.G.M., II*, the scenario described in Mr. Baker's statements was sufficiently farfetched that a reasonable person would not have taken them as a serious cause for concern—particularly when combined with the facts that they targeted people who did not exist, and were uttered to a public audience on a heated political issue. By contrast, the statement in *Callahan* reflected a genuine intent to assassinate the President and Vice President, even if the means to carry out the assassination were lacking.

This Court's only other invocation of this conditional threats rule further highlights the protected nature of Mr. Baker's statements. In *United States v. Castillo*, the Court upheld the conviction of a man for posting on Facebook, "[T]hat's the last straw. If [Obama] gets re-elected, I'm going to hunt him down and kill him and watch the life disappear from his eyes," and then reaffirming that he meant what he said after President Obama was re-elected. 564 F. App'x 500, 501, 504 (11th Cir. 2014). The Court held that the speech was not protected in part because, "at the time that [the defendant] told Secret Service that he meant what he had said, the President had been re-elected, so that the condition in question had been fulfilled." *Id.* at 504. In contrast, here, Mr. Baker's conditions had not been fulfilled when he posted his statements; indeed, they were never fulfilled.

### B. Mr. Baker's statements were about people who did not exist.

Relatedly, Mr. Baker's statements also fail the requirement that a true threat

must express an intent "to commit an act of unlawful violence *to a particular individual or group*." *Black*, 538 U.S. at 359 (emphasis added). In other words, it must be "[]likely to be interpreted as a real threat *to a real person*." *Elonis*, 575 U.S. at 747 (2015) (Alito, J., concurring in part and dissenting in part) (emphasis added). In contrast, speech that is "not directed at specific individuals" is more likely to "reasonably be characterized as [protected] political rhetoric or hyperbole." *Fogel v. Collins*, 531 F.3d 824, 830 (9th Cir. 2008). Indeed, "[t]here were no individualized threats in *Brandenburg*, *Watts*, or *Claiborne*"—all cases in which the Supreme Court concluded the speech at issue was protected. *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1086 (9th Cir. 2002), *as amended on denial of reh'g en banc* (9th Cir. July 10, 2002).

Mr. Baker's statements fail this requirement because they targeted a group that did not exist. The same would hold true for a statement encouraging violence against individuals who led the conspiracy to steal the 2020 election.[8] Had Mr. Baker threatened to, for example, trap anyone present at the Florida Capitol on January 20 inside, this would be a different case. While that would not have identified specific individuals by name, it would have reasonably placed existing people—for example, those who work at the Capitol, or those who planned to attend a hearing that day—

---

[8] *See, e.g.*, Bump, *supra* note 4 (OAN correspondent suggested "execution" as a way to "deal[] with" "traitors who . . . tried to steal power by taking away the voices of the American people").

in fear, and the threatened violence would have been plausible. *See, e.g.*, *Haughwout v. Tordenti*, 332 Conn. 559, 563, 580 (Conn. 2019) (holding that several statements about "shoot[ing] up this school" that did not identify particular individuals were nevertheless true threats because "[t]he fear of indiscriminate and random death and injury that results from mass shootings, like Sandy Hook, Virginia Tech, and Columbine, . . . is shared by any one of the many people who must frequent a public place . . . that has been the subject of a threat."). But that is not what Mr. Baker said. Instead, his statements contemplated armed resistance against a *non-existent* treasonous militia.

In *United States v. O'Dwyer*, the Fifth Circuit affirmed the district court's dismissal of an indictment under 18 U.S.C. § 875(c) because the statement at issue did not target a particular individual or group. 443 F. App'x 18, 20 (5th Cir. 2011) (per curiam). The defendant, a debtor, had emailed "a bankruptcy court employee, with a message for [his bankruptcy judge]" asking for permission "to pay for his anti-depressant medication" and suggesting that bad consequences would follow if his request were denied: "[S]uppose I become 'homicidal?' Given the recent 'security breach' at [the courthouse], a number of scoundrels might be at risk if I DO become homicidal." *Id.* at 19. The Fifth Circuit held that the "statement is not a true threat as a matter of law" because it was "hypothetical and conditional," and because

it "never identified any individual whom [the defendant] intended to harm." *Id.* at 20. The same is true here.

### C. Mr. Baker's statements were communicated publicly on a heated political issue.

Even if this were a borderline case, the special protection afforded to speech on public issues would tip the scales decisively in favor of reversal. Mr. Baker's statements were made to the public, on a matter of public concern. He published the posts on Facebook—one on his page and the other on that of a local TV station—in the midst of political discussions about whether the 2020 election was stolen, and what exactly occurred during the January 6 riot.

This Court has recognized that speech on matters of public concern "is afforded greater First Amendment protection" even in true threats prosecutions. *Fleury*, 20 F.4th at 1364. Otherwise, "the free and robust debate of public issues" could be chilled, and the "meaningful dialogue of ideas" would suffer. *Id.* (citing *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)). "It is a fundamental tenet of First Amendment jurisprudence that political speech in a public arena is different from purely private speech directed at an individual. . . . Political speech, ugly or frightening as it may sometimes be, lies at the heart of our democratic process. Private threats delivered one-on-one do not." *Planned Parenthood*, 290 F.3d at 1088–89 (Reinhardt, J., dissenting).

In addition to concerns about protecting political speech, extreme rhetoric is more likely to be protected when it is political because "[t]he language of the political arena . . . is often vituperative, abusive, and inexact," and so "may well include vehement, caustic, and sometimes unpleasantly sharp attacks[.]" *Watts*, 394 U.S. at 708. *See also Bauer v. Sampson*, 261 F.3d 775, 783–84 (9th Cir. 2001), *as amended* (9th Cir. Oct. 15, 2001) (holding that writings "made in an underground campus newspaper in the broader context of especially contentious campus politics" were "patently *not* true threats" even though they "ha[d] some violent content").

Finally, "[s]peech that is part of . . . public discourse is far less likely to be a true threat than statements contained in private communications or in face-to-face confrontations," *Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 521 (Ariz. 2005) (en banc), in part because a "diffuse public" threat is typically less "likely to be taken seriously," *Planned Parenthood*, 290 F.3d at 1086. *See also United States v. Carmichael*, 326 F. Supp. 2d 1267, 1282–83 (M.D. Ala. 2004), *order supplemented*, 326 F. Supp. 2d 1303 (M.D. Ala. 2004) (holding that posting about people on a website is less threatening than communicating with those people directly). That is particularly true where, as here, the threat could not have been sent to any particular target because no such targets existed.

Mr. Baker's statements may have been intemperate, but the First Amendment protects a great deal of political advocacy that many people would find offensive or alarming. Indeed, the distinction between political hyperbole and true threats is perhaps most important to keep in mind where, as here, a defendant holds unpopular or controversial views. Such individuals' use of "violent and extreme rhetoric, even if intended simply to convey an idea or express displeasure, is more likely to strike a reasonable person as threatening." *United States v. White*, 670 F.3d 498, 525 (4th Cir. 2012) (opinion of Floyd, J.), *abrogated on other grounds by United States v. White*, 810 F.3d 212 (2016); *cf. Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."). But punishing such speech would ignore the fact that free speech may "best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).

## III.   THIS IS A FAILED INCITEMENT PROSECUTION IN DISGUISE, WHICH IS IMPROPER UNDER THE PLAIN TERMS OF 18 U.S.C. § 875(C).

In addition to violating Mr. Baker's First Amendment rights because his statements were not true threats, this prosecution reflects a category error. Mr. Baker's statements—two public "call[s]" urging his audience to "RISE UP" and "[h]elp protect [their] community from terrorists," *see* Gov. Exh. 2B—constituted

public advocacy, not private threats. *See also* Gov. Exh. 1B (encouraging readers to "Call all of your friends and Rise Up!"). The posts strongly condemned those who attacked the U.S. Capitol on January 6, 2021, and encouraged "ALL FLORIDA RESIDENTS" to "RISE UP" and "[j]oin us" in "protect[ing] your community from terrorists" if a similar attack occurred in Florida. *See* Gov. Exh. 2B. In short, the posts were a plea to others to defend the state capitol building if it came under attack by armed mobs.

To ensure that public debate remains "uninhibited, robust, and wide-open," *New York Times Co.*, 376 U.S. at 270, the First Amendment broadly protects such public advocacy, even when it directly encourages illegal conduct or violence. "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). Equally, the "mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982) (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)).

"Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause." *Id.* at 928. Accordingly, "the constitutional guarantees of free speech and free press . . . permit a State to forbid or proscribe advocacy of the use of force or of law violation

[only] where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. "When such appeals do not incite lawless action, they must be regarded as protected speech." *Claiborne Hardware*, 458 U.S. at 928.

The incitement doctrine—not the true threats doctrine—is the proper test for determining whether public advocacy to violence is constitutionally protected. The Supreme Court's analysis in *Claiborne Hardware* is instructive. In that case, the Court considered whether statements made by Charles Evers, the organizer of a boycott campaign, were protected under the First Amendment. *Id.* at 902. At one rally, Mr. Evers told the "several hundred people" in attendance, "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck." *Id.* At another, he stated "that boycott violators would be 'disciplined' by their own people," and "warned that the Sheriff could not sleep with"—that is, protect— "boycott violators at night." *Id.* His audience knew that boycott violators were tracked, had their names read aloud at NAACP meetings and published in a local paper, and, in some instances, were subjected to violence or property damage. *Id.* at 903–04.

Amidst this "passionate atmosphere," the Court acknowledged that the speeches "might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence[.]" *Id.* at 927. And yet the Court

held that Mr. Evers' statements were constitutionally protected because they did not amount to incitement under the *Brandenburg* analysis. *See id.* The Court nowhere suggested that Mr. Evers' statements might qualify as unprotected true threats. *See id.* at 928 n.71 (citing *Watts*, 394 U.S. at 706, 708, for the proposition that statements of political opposition do not constitute true threats, even if they use violent language).

Since *Claiborne*, several circuit courts have emphasized the difference between threats and public advocacy of violence, and have construed federal threat statutes to exclude the latter. In *United States v. White,* the Fourth Circuit held that a defendant could not be convicted under Section 875(c) for posting "language [that] was clearly directed to others in the form of advocacy." 670 F.3d at 513. Considering the defendant's posts—which all lambasted one individual and stated, "Good. Now someone [go firebomb his house]"; "[he] should be drug [*sic*] out into the street and shot"; and "he must be killed," *id.* at 505–06—the court concluded that, while "[t]hese communications clearly called for someone to kill [the alleged victim]," they could not constitute threats, *id.* at 514. While "a direction to others . . . could have amounted to a threat if [the defendant] had some control those other persons or if [his] violent commands in the past had predictably been carried out," without such facts, they could not qualify as threats under Section 875(c). *Id.* at 513. The same is true here.

24

Similarly, in *United States v. Bagdasarian*, assessing the plain language of a federal statute that makes it a crime to "threaten[] to kill, kidnap, or inflict bodily harm upon [a major presidential candidate or a member of their family]," 18 U.S.C. § 879(a)(3), the Ninth Circuit held that the statute does not reach speech predicting that violence will occur or encouraging others to engage in violence. 652 F.3d 1113, 1119 & n.18 (9th Cir. 2011). As a result, the court held that a defendant's racially charged posts on online message boards stating that then-candidate President Obama "will have a 50 cal in the head soon" and also simply "shoot [him]," *id.* at 1115, did "not constitute a threat and do not fall within the offense punished by the statute," *id*. at 1120, because "one is predictive in nature and the other exhortatory," *id.* at 1122. *Cf. New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001) ("[G]enerally, a person who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear.").

Like the federal threats statute at issue in *Bagdasarian*, 18 U.S.C. § 875(c) does not "make[] criminal an intention or tendency to encourage others to injure" other people. *Bagdasarian*, 652 F.3d at 1119 n.18. As such, it cannot be used to prosecute a call, issued to members of the public over whom the defendant has no control, focused on a heated political issue, encouraging—but not inciting—others to engage in unlawful acts.

At most, Mr. Baker's posts invited Floridians to take the defense of the republic into their own hands if necessary. As in *Claiborne*, the statements constituted "an impassioned" and "political" "plea for . . . citizens to unify [and] to support . . . each other." 458 U.S. at 928. As in *White*, Mr. Baker had no control over his audience. And, as in *Bagdasarian*, the posts were predictive and exhortatory, not threatening. 652 F. 3d at 1120. As a result, 18 U.S.C. § 875(c), by its own terms does not reach Mr. Baker's statements.

## CONCLUSION

For these reasons, this Court should reverse the court below and hold that Mr. Baker's statements were protected by the First Amendment.

Dated: January 25, 2022                 Respectfully submitted,

                                        */s/ Vera Eidelman*
                                        Vera Eidelman
                                        Brian Hauss
                                        AMERICAN CIVIL LIBERTIES
                                            UNION FOUNDATION
                                        125 Broad Street, 18th Floor
                                        New York, NY 10004
                                        Tel.: (212) 549-2500
                                        veidelman@aclu.org
                                        bhauss@aclu.org

                                        Daniel Tilley
                                        AMERICAN CIVIL LIBERTIES
                                            FOUNDATION UNION OF
                                            FLORIDA
                                        Florida Bar No. 102882

4343 W. Flagler St., Suite 400
Miami, FL 33134
Tel.: (786) 363-2714
dtilley@aclufl.org

Ilya Shapiro
Thomas A. Berry
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, D.C. 20001
Tel.: (202) 842-0200
ishapiro@cato.org
tberry@cato.org

*Counsel for Amici Curiae**

*Laura Moraff, Brennan Fellow at the ACLU's Speech, Privacy & Technology Project, contributed substantial research and drafting to this brief.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this Brief of Amici Curiae in Support of Plaintiff–Appellant and Reversal complies with the type-volume limitation, typeface requirements, and type style requirements of Federal Rules of Appellate Procedure 32(a) because it contains 6,161 words and has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using the word-processing system Microsoft Word 2016.

Dated: January 25, 2022                    By: */s/ Vera Eidelman*
                                                Vera Eidelman

                                                *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2022, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.


Dated: January 25, 2022                    By:  */s/ Vera Eidelman*
                                                Vera Eidelman

                                                *Counsel for Amici Curiae*